## UNITED STATES v. COMMODORE PARK, INC.

No. 495. Argued February 9, 1945.—Decided March 26, 1945.

*Solicitor General Fahy*, with whom *Messrs. J. Edward Williams, Chester T. Lane* and *Vernon L. Wilkinson* were on the brief, for the United States.

*Mr. W. R. Ashburn* for respondent.

MR. JUSTICE BLACK delivered the opinion of the Court.

The United States dredged a tidewater navigable bay and deposited the dredged materials in a navigable arm of the bay called Mason Creek, thereby destroying its navigability, and impairing certain benefits alleged to inhere in the proximity of the land to a navigable tidewater creek. The broad question presented is whether the Fifth Amendment requires the government to compensate an owner of residential property contiguous to the creek, whose fast lands, though not physically invaded, were decreased in market value.

Commodore Park, Inc., an owner of lands on the creek about a mile away from the filled-in segment, brought this suit in the District Court under the Tucker Act, 24 Stat. 505, 28 U. S. C. 41 (20) for damages resulting from a "taking" by the government of its property for public use, in connection with a naval facilities expansion program. As the case comes to us,[1] the material findings,

---

[1] In the District Court respondent also claimed that mud and silt had been cast on his fast lands. This part of the claim was denied by the District Court, and we need not consider it. With reference to it the Circuit Court of Appeals said: "This relief dredging gave rise to the additional claim on the part of the plaintiff that mud and silt had been deposited on its land, not only between high and low water mark but also above high water mark. But the District Judge disallowed this part of the claim as he found that no material damage had been suffered in excess of the benefit which the plaintiff had derived from the partial filling of low marshes, inlets and coves on its property. No appeal was taken by the plaintiff." *United States* v. *Commodore Park*, 143 F. 2d 720, 722.

which we accept, are that the government (1) caused mud and silt to settle on that part of the land in question lying in the bed of what had been a navigable tidewater creek before the project was completed, and (2) destroyed the navigability of the creek, thereby depriving respondent of that part of the market value of its fast land attributable to its proximity and accessibility to a fresh tidewater creek in its natural and navigable state. The government's answer, so far as material to our decision, is that respondent's alleged ownership of the land between high and low water marks and its "riparian rights" of access to the navigable waters both were subordinate to the government's plenary authority over navigable waters of the United States, that its program was effectuated pursuant to that authority, and that consequently there had been no "taking" of "private property" within the meaning of the Fifth Amendment.

The District Court held that the entire project had no substantial relation to navigation or commerce, and found that the market value of the land lying between high and low water marks had been decreased by the mud and silt deposits, and that respondent's fast land had been reduced in value because of the loss of the riparian rights of access for navigation, fishing, boating, and the like. It accordingly rendered judgment for respondent "for the damages it . . . sustained as a result of the taking of its riparian rights and lands . . ." The Circuit Court of Appeals unanimously agreed that the dredging operation was done in furtherance of navigation and commerce, but a majority held that the depositing of the dredged material in the creek was not in aid of navigation, and therefore affirmed the District Court. 143 F. 2d 720. Because it is important that the government's power to engage in projects in aid of navigation and commerce be clearly defined, we granted certiorari, 323 U. S. 698.

A few additional facts drawn from the record will serve to clarify the issues.

In 1940, the respondent owned a residential real estate development in Norfolk, Virginia, located on the east side of Mason Creek, a navigable tidewater which extended inland about four or five miles from the navigable waters of Willoughby Bay. West of Mason Creek, and adjacent to Willoughby Bay, was located the Hampton Roads Naval Operating Base, which maintained a Naval Air Station with shore facilities for seaplanes. It was this station which, under the authority of Congress,[2] the Navy Department enlarged and improved. In order to provide suitable waters for the operation of large seaplanes, the Navy, acting in conjunction with the War Department, 30 Stat. 1121, 1151–1155, dredged Willoughby Bay to a depth of 10 to 15 feet below mean low water. Additional lands, adjacent to the base, were bought or condemned by the government, on both the east and west sides of Mason Creek. The materials dredged from the bay were in part deposited in Mason Creek between the shores of lands owned by the government adjacent to the bay. By this process, the bed of Mason Creek was at that point raised to the level of its shores, thereby becoming incorporated as an integral and useful part of the Naval Operating Base. This fill, reinforced by bulwarks, dykes and retaining walls, cut off the remainder of Mason Creek, along which respondent's land bordered, from any navigable outlet to Willoughby Bay and the sea. It also blocked off the tidal movements which previously had provided an element of freshness in Mason Creek's waters, thereby resulting in a standing and stagnant pool. This condition, at the request of property owners, was later alleviated by digging a channel in the stream's bed, and

[2] 48 Stat. 957; 53 Stat. 590–592; 53 Stat. 757, 772–773.

connecting it with the bay by a culvert, much smaller in area than the original bed. An iron grate, placed where the culvert emptied its waters into the bay, closed it to navigation. We must take it from the findings below that the size and construction of the culvert were inadequate to afford a completely free tidal movement, and that as a result, the waters of Mason Creek became "semi-stagnant," depriving them of the same freshness they had possessed before the work was done.

*First.* The judgment for respondent involves no physical invasion of its fast lands. Its property was more than a mile from the fill made in Mason Creek. The only land for which compensation was awarded because of mud and silt deposits was that part of the creek's bed between high and low water marks. That Virginia recognizes respondent's title to such land [3] cannot give respondent a right to compensation if its market value is impaired as a result of work done by the United States in the interest of improvement of navigation. *United States* v. *Chicago, M., St. P. & P. R. Co.,* 312 U. S. 592, 596–598, set at rest any remaining doubt concerning the dominant power of the government to control and regulate navigable waters in the interest of commerce,[4] without payment of compensation to one who under state law may hold "technical" legal title (as between himself and others than the government) to a part of the navigable stream's bed.

*Second.* Nor does a riparian owner acquire a unique private right distinct from that held by all others, to have access to and enjoyment of navigable waters and to recover compensation from the government because deprived of that privilege by an authorized governmental

---

[3] *Scott* v. *Doughty,* 124 Va. 358, 97 S. E. 802; *Hite* v. *Town of Luray,* 175 Va. 218, 8 S. E. 2d 369.

[4] *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53, 60, 62, 68, 72; *Scranton* v. *Wheeler,* 179 U. S. 141, 163.

change in a stream.[5] Respondent's property was always subject to a dominant servitude; it did not have a vested right to have this navigable stream remain fixed and unaltered simply because of the consequent reflected additional market value to adjacent lands. Whatever market value of riparian lands may be attributable to their closeness to navigable waters, does not detract from the government's "absolute" power,[6] in the interests of commerce, to make necessary changes in a stream. In short, as against the demands of commerce, an owner of land adjacent to navigable waters, whose fast lands are left uninvaded, has no private riparian rights of access to the waters to do such things as "fishing and boating and the like," for which rights the government must pay.[7] Riparian rights of access to navigable waters cannot, as against the government's power to control commerce, be bought and sold.

*Third.* It is argued that the foregoing rule of governmental non-liability is inapplicable to this case. Since the Navy Department originated this plan with a view to improvement of shore facilities, we are asked to hold that neither the dredging in Willoughby Bay nor the deposit of the dredged material in Mason Creek bore any real or substantial relation to commerce or navigation. Such a holding was the basis of the District Court's judgment. The Circuit Court held that the dredging in Willoughby Bay was, but the deposit in Mason Creek was not, related to commerce or navigation. We cannot agree. The "fact that purposes other than navigation will also be served could not invalidate the exercise of the authority con-

---

[5] *Scranton* v. *Wheeler, supra,* 159–160; *Stockton* v. *Baltimore & N. Y. R. Co.,* 32 F. 9, 20.

[6] *United States* v. *River Rouge Co.,* 269 U. S. 411, 419; *Gilman* v. *Philadelphia,* 3 Wall. 713, 724–5.

[7] *Gibson* v. *United States,* 166 U. S. 269; *Scranton* v. *Wheeler, supra.*

ferred, even if those other purposes would not alone have justified an exercise of Congressional power." *Arizona* v. *California*, 283 U. S. 423, 456.

All the waters affected were navigable. The Constitution entrusted to Congress the responsibility of determining what obstructions may, or may not, be placed in such waters.[8] This power Congress may exercise itself or through its duly authorized agents.[9] Here, the War Department, selected by Congress to pass upon when, and to what extent, navigable waters may be altered or obstructed, permitted, and actually supervised, the program accomplished. Even though cases might arise in which the courts would look behind the judgment of this specially authorized agency,[10] this is not such a case.

While this project touched two separate, although closely related, bodies of navigable waters, and looked to improvement of shore as well as water facilities, the entire program as to the waters was designed to achieve one closely integrated unit. That there were two bodies of navigable waters to which the one program related, does not detract from Congressional power as to either, for its powers are broad enough to justify one unified program for the connected body of waters to the end that commerce in general may be fostered.[11]

Thus, having power under the Commerce Clause to obstruct navigation by depositing the dredged soil in Wil-

---

[8] *United States* v. *Chandler-Dunbar Co., supra*, 62–67; *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 18 How. 421.

[9] *Union Bridge Co.* v. *United States*, 204 U. S. 364, 377–388; *Greenleaf-Johnson Lumber Co.* v. *Garrison*, 237 U. S. 251, 268; *South Carolina* v. *Georgia*, 93 U. S. 4, 13.

[10] See *Greenleaf-Johnson Lumber Co.* v. *Garrison, supra*, 268; *United States* v. *Appalachian Electric Power Co.*, 311 U. S. 377, 424; *Arizona* v. *California*, 283 U. S. 423, 456.

[11] *United States* v. *Appalachian Power Co., supra*, 426–437; *Oklahoma* v. *Atkinson Co.*, 313 U. S. 508, 527–528.

loughby Bay, the government was likewise authorized to deposit in Mason Creek for the same purpose. There is power to block navigation at one place to foster it at another.[12] Whether this blocking be done by altering the stream's course, by lighthouses, jetties, piers, or a dam made of dredged material, the government's power is the same and in the instant case is derived from the same source—its authority to regulate commerce. Since the judgment awarded rested entirely upon the conclusion that respondent's property had been taken by "filling and closing Mason Creek," and since all of respondent's "riparian rights" were subordinate to the government's power to close the stream, the judgment is

*Reversed.*

MR. JUSTICE ROBERTS is of the opinion that the judgment should be affirmed for the reasons stated in the opinion of the Circuit Court of Appeals, 143 F. 2d 721.

---

[12] *South Carolina* v. *Georgia, supra; Scranton* v. *Wheeler, supra; Arizona* v. *California, supra,* 451–452.