## HURLEY v. AMERICAN ENKA CORPORATION.

### Civ. No. 538.

United States District Court
E. D. Tennessee, N. E. D.

Sept. 29, 1950.

5.  Cafferty v. Southern Tier Pub. Co., 226 N.Y. 87, 93, 123 N.E. 76, 78.

6.  Fleckenstein v. Friedman, 266 N.Y. 19, 23, 193 N.E. 537, 538.

Milligan & Haynes and Nat R. Coleman, Jr., all of Greeneville, Tenn., for plaintiff.

Egerton, McAfee, Armistead & Davis, Knoxville, Tenn., W. J. Barron, Morristown, Tenn., for defendant.

ROBERT L. TAYLOR, District Judge.

Plaintiff brought this action for damages, and for an injunction to restrain defendant from maintaining a dam, with an alternate prayer for additional damages in the event the injunction is denied.

About the year 1923, plaintiff and his brother Claude Hurley became owners as tenants in common of certain tracts of land located in or along the Nolichucky River, between Hamblen County and Cocke County, Tennessee. By deed of September 7, 1946, Claude Hurley conveyed to plaintiff his interests in those lands, described in the deed as islands, and in an additional tract opposite them on the mainland and on the Hamblen County side of the river. The lands here in controversy are two of the so-called islands, conveyed by those deeds.

In May of 1948, the defendant, owner and operator of an industrial plant at Lowland in Hamblen County, completed construction of a dam across the Nolichucky River a few hundred feet below the location of plaintiff's lands. As a result of the construction of the dam, plaintiff's road, or ford, from his mainland property to the larger of the two islands, herein called Thomas Island, has been inundated to such a depth as materially to restrict his freedom of access to the island with power-operated machinery. Prior to construction of the dam he unquestionably had such access to the larger island during farming seasons of the year, and from this island he was able to reach the smaller, or Watermelon Island, a short distance downstream. Since construction of the dam, in passing to and from Thomas Island he is forced to rely largely upon the use of horse-drawn vehicles and machinery, and his access to Watermelon Island, even with those, has been rendered impracticable. Also, the rise of water back of the dam has caused severance from Watermelon Island of a tract referred to herein as a towhead. The acreage of the larger and smaller islands and the towhead are approximately 37 acres, 3½ acres and ¼ acre.

Mainland property of the plaintiff lies opposite the central portion of Thomas Island. The two in relation to each other form

roughly a capital "T", the mainland portion being the staff and the island the transverse of the "T". Between the staff and the transverse is a large ditch, approximately 30 feet in width at a height of 5 feet from the bottom, or trough. This ditch has its beginning at the upper end of Thomas Island, and its ending at the lower end of the towhead. It is variously referred to as a ditch, a sluice, or a chute. In the dry months of the year the sluice formerly contained little or no running water, its course being alternately still pools and areas of dry, or practically dry, land. In times of freshet and flood, a stream varying from a few inches to several feet in depth flowed through the sluice, the depth increasing, of course, as the water rose in the main stream of the river.

Mr. Virgil O. Powell, a civil engineer and a witness for defendant, testified as follows concerning the sluice: "That sluice is very sluggish, * * * it has logs and sandbars and brush, and if you really got the proper capacity out of that size ditch—it is really a large ditch—you should have to clean it out, clean out the logs, the obstructions." What has been said by way of describing the sluice applied generally, that is, to reaches of the sluice adjacent to both islands.

Since the construction of defendant's dam, water has backed into the sluice, materially changing conditions from the standpoint of access to the islands. The dam is between five and six feet in height above bed level. Mr. Powell's testimony establishes certain elevations as follows: The stream bed, 998 feet above sea level; primary overflow level, or central section of the dam, 1002.1; the upper level of the dam, 1003.1. Those readings would give the dam a primary overflow height of 4.1 feet and an over-all height of 5.1 feet. No water flows over the 5.1-foot level except when the total flowage exceeds 2000 cubic feet per second. There is nothing to show where the measurements were made, and nothing to show that the river floor is level, or parallel to the top of the dam. For all that appears, the river channel may have been of variable depths, a possibility that would be material as to the flow of the river in its natural state.

The same witness testified that with a flowage of 2000 cubic feet per second, which is a low-flood condition, the depth of the water between the points of Thomas Island and Watermelon Island, before the dam was constructed, would have been 2.4 feet. With the dam in place, it is 4.3 feet. The main ford, that from the mainland to Thomas Island, prior to the dam, would have had a depth of 1.7 feet, when the flowage was 2000. With the dam in place and the flowage at 2000, the depth is 2.3 feet. This witness testified that the effects of the dam played out near the head of Thomas Island, raising the level there no more than two or three inches.

This testimony, while of much value, requires some qualification. The average annual flow of the river is given as 2184. The flowage, however, varies from a record low of 472 to a record high of 13,400, while the flowage for ordinary low is 1250. Ascertainment of the natural flowage is complicated by the existence several miles upstream of a power dam, known as Greeneville, or Nolichucky, dam. When that power plant is in operation, the flowage from its maximum release is 3000. This maximum release results in somewhat higher water levels at the two fords.

No data was offered through the witness as to theoretical conditions at the fords during times of low water, either before or after construction of defendant's dam, hence the true conditions are to be discovered through the testimony of eyewitnesses. As to the condition of the sluice at the main ford before construction of the dam, witnesses testified as follows:

James Y. Hurley (the plaintiff): "There wasn't any water in it the majority of the time."

J. C. Carmichael: "Before they built the dam I crossed there a number of times when the water wasn't more than two inches deep."

J. A. Bewley (who rented Thomas Island for pasturage in 1940): "It was practically dry. The only water that was there

at that time was just pools of water, you know, holes here and there."

Roy Ewing (as to 1939 and 1941): "Just a little water trickling along. You could just step over it."

Estil Hale: "During the summer months, crop time, there was very little water there. Most of the time you could go across without getting your feet wet. You might have to make a hop here and a jump there."

Hal S. Hale: "There was no water in it at the times that I crossed it working for the AAA office, no water in it at all there at the ford." (NOTE: This same witness testified that he walked from Thomas Island to Watermelon Island by stepping on rocks.)

Charles Hurley: "In normal water, lots of times you could walk across it, you know. If you have a wet season it would be up a little bit, and if you have a dry season it was practically dry."

The situation was similar as to the sluice between Watermelon Island and the mainland. Plaintiff's access to Watermelon Island was necessarily by way of Thomas Island, for the reason that he did not own the mainland opposite Watermelon Island. Nor did he own the mainland opposite the upper portion of Thomas Island. His only feasible approach to Thomas Island was this ford, which was a continuation of the farm road that came down from his farm buildings located on the same side of the river as the ford.

The foregoing descriptions of the sluice and the ford are material in consideration of plaintiff's title to the affected farmlands. Defendant has taken the position that drowning of the fords is not compensable, if Nolichucky River is held to be a navigable stream, and much of defendant's evidence is aimed at showing that the river is navigable. Opposing proof on the point is likewise extensive, and there would be some justification for a holding that the river in its natural state is non-navigable, but could be made navigable at an expense which possibly would not be prohibitive. The Court, however, does not deem it necessary to pass upon so controversial and important a question in order to decide the case.

This is not a controversy between the United States and a private individual. If such were the nature of the controversy, a decision on the issue of navigability might be unavoidable. This would be so, because of the points of conflict between ownership of riparian lands and the servitude imposed thereon by reason of navigability. In the State of Tennessee, an owner of land adjacent to a non-navigable stream may own the stream bed, but where the stream is navigable his ownership may not extend below the low-water mark. Cunningham v. Prevow, 28 Tenn.App. 643, 192 S.W.2d 338; Elder v. Burrus, 25 Tenn. 358; Tallassee Power Co. v. Clark, 6 Cir., 77 F.2d 601. But whether under state law a riparian owner may claim title to the low-water mark, to the river bed to the thread of the stream, or to the whole bed of the stream, if the stream is navigable his land up to the high-water mark is subject to the navigation servitude vested in the federal government by virtue of the commerce clause of the Constitution. United States v. Chicago, M., St. P. & P. R. Co., 312 U.S. 592, 313 U.S. 543, 61 S.Ct. 772, 85 L.Ed. 1064. This navigation easement which extends to the high-water mark, is derived from the Constitution and finds implementation in acts of Congress, and its exercise is made effective through Congress itself, or through agencies of the federal government authorized to exercise it. United States v. Commodore Park, Inc., 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017. It is not, as against riparian lands, an easement which other agencies or individuals may assert, or under which they may find shelter from the consequences of their trespasses. Yates v. Milwaukee, 10 Wall. 497, 77 U.S. 497, 19 L.Ed. 984.

By the deeds heretofore mentioned, plaintiff acquired title to the bed of the sluice. The deed from Claude Hurley to plaintiff, like prior deeds to the same land, concludes its description thus: "* * * thence north 14 West 22 poles crossing said river to a stake near where formerly stood a white oak corner between the heirs of Joseph Davis and James Talley; thence with the meanderings of the river to the head of the sluice; thence with the mean-

derings of the sluice to the lower corner of the Soldier Rest Farm * * * including three islands in said river, containing about 40 acres, not including the land actually covered by the waters of said river." Description of the mainland tract begins at a point some distance from the river and in its progress reaches a point in "the center of the sluice." Its course is "thence up the sluice * * * to a stake in the sluice." Its course then turns to the mainland and goes back to the beginning.

■ Although there is an ambiguity as to whether the first deed purports to convey the bed of the river, the intent of the two deeds to convey the bed of the sluice is not ambiguous. Technically, therefore, plaintiff has title to a farm that extends uninterruptedly from the outermost bounds of the mainland tract across Thomas Island to the low-water mark of the main stream of Nollichucky River, if not beyond. Assuming, without so holding, that the river is navigable and that the sluice is a part of the river, plaintiff still has title to the land down to the low-water mark on each side of the sluice. At low water, the space between the two low-water marks is slight and at the ford, for all practical purposes, disappears altogether. The result still is, as between these parties, whether the Nolichucky is navigable or not, that plaintiff owns at the area of the ford a continuous tract of land. By flooding the sluice, defendant has trespassed upon private property and has restricted plaintiff's access to Thomas Island and, in greater degree, that to Watermelon Island.

[5] Defendant has undertaken to justify its construction and maintenance of the dam by exhibiting an authorization from the Department of the Army, an approval of plans from the Tennessee Valley Authority, and a resolution of consent from the County Court of Hamblen County. By reason of these official acts, defendant's position is that of a permittee only. Nowhere is there an assignment of the Government's navigation easement, nor is there any intimation that the proposed dam was to be in aid of navigation. The purpose of defendant was to provide itself with a water supply for use as water in its industrial plant, located at a considerable distance from the river.

■■ Plaintiff and defendant are both riparian owners. As such, each has a right to make reasonable use of the stream. Tallassee Power Co. v. Clark, 6 Cir., 77 F.2d 601. But in the exercise of the use privilege, neither has a right to take the property of the other, and for the reason that defendant has inundated lands of plaintiff and in effect taken property of plaintiff without compensating him therefor, the Court finds as a fact that defendant's use of the river is unreasonable.

■ Though the Court so finds, it is of the opinion that plaintiff should be remitted to his damages, and that an injunction against maintenance of the dam should be denied. Denial of injunctive relief takes into consideration that defendant's use of the river waters serves a good purpose in that it supplies an essential need in the operation of a large industrial plant, and that plaintiff has an adequate remedy at law. It is a situation in which, because of defendant's large investment and the number of persons employed, the balance of convenience doctrine should be invoked. Madison v. Ducktown Sulphur, Copper & Iron Co., 113 Tenn. 331, 83 S.W. 658.

■ Where an access road is outside the area of the navigation easement, hence not burdened with the immunity that stems from the navigation servitude, its destruction and the resultant damage to connecting lands are compensable. United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746. Plaintiff has introduced no proof as to the value of the land within the sluice and apparently is claiming no damages for its inundation. Damages alleged are losses in crop yield and harvest due to curtailment of his use of the access road and fords, flood damage to Thomas Island, removal of timber by defendant from the towhead, and reduction in market value of Thomas and Watermelon islands. As to the measure of damages, opinions differ widely, and as to the extent of certain items some of the witnesses refused to express an opinion.

Witnesses were asked to base their estimates of damages to the land upon the decrease in market value. Two witnesses for plaintiff placed the decrease in market value of Thomas Island at 33⅓%. Plaintiff placed it at 50%. A real estate dealer and witness for defendant placed the decrease in the value of Thomas Island at zero. Another witness for defendant estimated the cost of a bridge or fill across the sluice at the main ford at $325.00, but gave no estimate of the cost of a bridge to Watermelon Island. Plaintiff estimated the value of the timber removed from the towhead at $200.00. A real estate dealer, who saw the stumps, believed no merchantable timber had been removed. A former Tennessee Valley Authority timber cruiser estimated that the trees removed would have made about four cords of firewood, possibly worth about $4.00 per cord. Plaintiff's witnesses testified that Watermelon Island had been rendered worthless. One real estate dealer, testifying for defendant, placed the decrease in value of this island at $400.00. The second real estate dealer placed the decrease at what it would cost to provide new means of access to the island, but he gave no estimate of that cost. Tillable acreage of the islands was estimated to have had a former value from $250.00 to $500.00 per acre, and the decrease in market value of the larger island was variously estimated as from 0% to 50%. Plaintiff estimated crop losses for 1948 as follows: Soya beans, $400.00; corn shortage on Thomas Island, $840.00; complete loss of crop on Watermelon Island, from $180.00 to $225.00, all of which losses being attributed to curtailment or destruction of means of access to the islands.

As construction of the dam was commenced April 26, 1948, and completed May 20, 1948, crops for that year may not be considered as elements of damage, for the reason that loss or reduction of crop yield is the prime basis for measuring decrease in market value of the land, and allowance of damages for loss of crops not in existence upon completion of the dam would be a duplication of damages.

From a consideration and comparison of all the evidence, the Court finds, as a result of the building of the dam, the decrease in market value of Thomas Island to be $1600.00, that of Watermelon Island to be $400.00. The decrease in market value of Thomas Island is put on an acreage basis. In addition to the acreage decrease, the additional flood burden has caused a damage by way of wash, or erosion, in the amount of $200.00. The trees cut from the towhead had a stumpage value of $16.00. The total damages to which plaintiff is entitled, therefore, is $2,216.00.

Injunctive relief will be denied, and an order of final judgment in favor of plaintiff will be prepared for entry in the sum of $2,216.00.