**UNITED STATES of America,**
**Plaintiff,**

v.

**50 FOOT RIGHT OF WAY OR SERVITUDE IN, OVER AND ACROSS CERTAIN LAND Situate IN the CITY OF BAYONNE, HUDSON COUNTY, NEW JERSEY, and Daniel A. Ferenczi, et al.,**
**Defendants.**

**Civ. No. M 746a.**

United States District Court
D. New Jersey.

May 29, 1963.

---

3. Corabi v. Auto Racing, Inc., 264 F.2d 784, 785, 75 A.L.R.2d 711 (3 Cir. 1959).

the United States Government instituted condemnation proceedings to obtain an easement for a pipeline that was to run and now does run from Texas to Bayonne, N. J.

Part of this pipeline, approximately a mile long, runs across the bed of Newark Bay, a navigable body of water located in the State of New Jersey. Title to this land is in the State of New Jersey except where transferred to the predecessors in title of the Bergen Point Iron Works, Bayonne, N. J. A short part of it runs across the uplands of the Bergen Point Iron Works (hereinafter referred to as Bergen Point). The State of New Jersey in open court withdrew its claim to compensation, leaving only Bergen Point claiming compensation for the taking of the easement over its riparian rights, alleging that the pipeline obstructs its access to the navigable channels of Newark Bay and that it, Bergen Point, is damaged thereby.

A stipulation has been entered into by the Government and Bergen Point in substance as follows:

By Declaration of Taking dated September 26, 1947, a perpetual right of way or servitude, in, over, and across certain tracts of land situate in the County of Hudson, State of New Jersey, was taken by the United States of America. The premises subject to the Declaration were actually taken in possession on September 13, 1943.

Two grants of riparian lands were conveyed by the State of New Jersey to the Central Railroad of New Jersey and the Bayonne Improvement Co., respectively, and title to the lands contained in these two grants was, by mesne conveyances, eventually lodged in Bergen Point.

The property of Bergen Point Iron Works contains 4.322 acres, of which 136,500 square feet or 3.13 acres of upland and 51,700 square feet or 1.12 acres of land are under water out to the pierhead line of 1923 (1929).

David M. Satz, Jr., James D. Butler, Newark, N. J., Marcus Beckner, Dept. of Justice, Washington D. C., for Government.

Arthur J. Sills, Robert B. Kroner, Trenton, N. J., for defendant, State of New Jersey.

Carpenter, Bennett & Morrissey, Allan G. Freund, Samuel M. Coombs, Jr., Newark, N. J., for Bergen Iron Works.

MEANEY, District Judge.

Pursuant to the Second War Powers Act of 1942 § 201 (50 U.S.C.App. § 632)

A drawing, annexed to the stipulation as Exhibit E, entitled "North Lines 12″ Crude and 12″ Products Lines, Gulfport Junction to Bayonne Terminals, dated May 25, 1959," is a true representation of the depths at which the pipes for the transportation of petroleum products have been installed in the parcels taken by the United States on September 13, 1943, and sought to be condemned by these proceedings.

A preliminary hearing was held on the question of whether Bergen Point was entitled to any compensation other than for the easement on its upland, and decision was reserved. Reference to this determinative question will be made hereafter.

The court conducted a full hearing, considering the evidence of damage to Bergen Point, if it should be entitled to compensation for the damage resulting from the easement taken by the Government, affecting both the under water rights and the uplands, and, in the alternative, the damage resulting from the taking on the uplands alone.

From the testimony adduced by the witnesses for Bergen Point, no use had been made of water facilities between 1928 and the date of taking, nor was any application made subsequent thereto to the appropriate Federal Government authorities for any alteration in the situation which might afford access for Bergen Point to deep water, though in 1959 inquiry was addressed to a New Jersey agency along that line. Moreover, between 1928 and 1943 no use was made of a pier which extended from the shore line of Bergen Point approximately 195 feet to the pierhead line. As a matter of fact the pier had been permitted to degenerate so that in 1943 it consisted of piles projecting upward from the water. Furthermore, silt had accumulated so that the river bottom. at the Bergen Point property shelved from zero to 6 feet at the pier end. There was one occasion when a barge was brought up to the dilapidated and useless pier in or about 1957, being brought in at high water and resting on silt at low tide.

It would seem that the easement on the uplands occupied about 1,481 square feet at the far end of the property of Bergen Point, and considered apart from whatever damage the under water taking may have caused, the actual value of the upland taken was agreed by both appraisers to be nominal, $500.00 by the Bergen Point appraiser, and $100.00 by the government appraiser.

Each appraiser testified as to his opinion of the damage to Bergen Point if the effect of the under water easement is to be considered. There were no sales of exactly comparable properties at the time of taking, but Stewart, the appraiser for Bergen Point, testified as to a sale of water front property (Shiverick, seller) with riparian rights in Newark Bay in 1930, the sale price being $20,000.00 an acre, which he estimated to have decreased to $15,000.00 an acre in 1943. Another sale in 1937 on the same side of Newark Bay (Brown, seller) brought $18,000.00 an acre, but that too was subject to the general decline in value by 1943. Both of these properties had bulkheads, though on the Shiverick property the bulkhead had been built by the lessee.

Mr. William C. Stewart appraised the 4.32 acres of land of Bergen Point, including under water lands, at $15,000.00 per acre, or $64,700.00 (as he testified). He appraised the buildings at $211,200.-00 making a total valuation of the Bergen Point property at $275,900.00, this before the taking and including riparian rights. After the taking he appraised the land, including under water land, at $10,000.00 per acre, or $43,200.00. The improvements he valued at $209,800.00, deducting the utility damage to the dilapidated pier at $1,400.00. His appraisal of the total value of the property, after the taking, thus amounted to $253,-000.00, with a net loss to Bergen Point of $22,900.00. His appraisal was based on his estimate of one-third of the value of all the lands due to the interference of the pipeline with access by Bergen Point

to deep water, plus utility damage to the pier.

In the course of his testimony he said that as conditions existed in 1943, if Bergen Point had decided to use water transportation it would have been necessary to dredge a channel which could have been done by suction dredging, and also to drive steel piling to "hard pan" a depth of 20 to 25 feet. Evidently up to 1959 Bergen Point had been using rail and other methods of land transportation. It was only after the lapse of sixteen more years that Bergen Point took even tentative steps to ameliorate a condition which might have been remedied and might still be remedied, as was the case with another property affected by the position of the pipeline.

■ The government appraiser, Mr. Joel L. Schlesinger, also a qualified appraiser, was familiar with the details of the taking under the easement of 1,481 square feet on the upland, and an area of 15,507 square feet of under water lands from high water mark to the bulkhead line. He appraised the upland portion at $15,000.00 per acre, or $46,500.00 for 3.1 acres, and the under water lands at 50% of the upland plus 10% for merging of the two interests, or $11,715.00 for 1.42 acres. The total value of the Bergen Point property before taking, including improvements, he appraised at $213,700.00 and set the total value after taking at $207,850.00, thus assessing the damage at $5,850.00. It is his considered opinion that with a repaired dock at high water, a barge, which would seem to be the only type of vessel used at any time by Bergen Point, could be nudged into the dock side even with conditions as they are, and that by the expenditure of a comparatively small sum the pipeline could be lowered as it was in one other instance to permit passage of freight carrying scows. But aside from that he assessed the general damage to Bergen Point at $5,850.00, assuming that it was entitled to compensation for loss of access to deep water. All things considered, if Bergen Point is entitled to damages to its uplands by loss of water approach, it would seem that they must be measured by determining the uses made of the property before and after the taking, or which reasonably could have been made of it and the suitability, adaptability and availability for a particular use at the time of the taking. But "elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value." (Olson v. United States, 292 U.S. 246, at 257, 54 S.Ct. 704, at 709, 78 L.Ed. 1236).

Query—in the instant case where a long period of lack of use resulted in degeneration of the water front facilities without any attempt to maintain them—does this affect the use that reasonably could have been made at the time of taking, or the availability of the facilities without the expenditure of moneys for dredging, piling and restoration of the pier?

In view of the situation as indicated by the evidence, the measure of damage appraised by the government appraiser would seem to be within appropriate limits and the damage to Bergen Point would be assessed by this court at $5,-850.00, if it were entitled to damages arising out of its ownership of riparian rights, this plus interest since the date of taking.

■■ But there remains the important question of whether the United States must pay for riparian rights in navigable waters, condemned for use in interstate commerce. There would seem to be no doubt that the pipeline was to be used and is used in interstate commerce. Whatever rights the Government has over navigable waters derives from the commerce clause of the Constitution. The extent to which these rights reach is what is now to be determined. Bergen Point contends that the dominance of the United States is concerned only with questions of navigation and as a matter

of fact many of the cases. establishing the rights of the United States are concerned with matters involving navigation. But the right to control navigation, drawn as it is from the commerce clause, does not exhaust the servitude imposed on navigable streams, as is evidenced by the decisions of the Supreme Court in Stockton v. Baltimore & N. Y. R. Co., 3 Cir., 32 F. 9, United States v. Appalachian Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243, and United States v. Commodore Park, Inc., 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017.

In United States v. Appalachian Power Co., supra, the court states, 311 U.S. at p. 426, 61 S.Ct. at p. 308:

> "In our view, it cannot properly be said that the constitutional power of the United States over its waters is limited to control for navigation. By navigation respondent. means no more than operation of boats and improvement of the waterway itself. In truth the authority of the United States is *the regulation of commerce on its waters*. Navigability, in the sense just stated, is but a part of this whole." (Emphasis supplied)

In finding that the Federal Government had the constitutional power to obtain, without compensation, riparian rights granted by a state, the court in the same case, 311 U.S. at page 428, 61 S.Ct. at page 309, further states:

> "Such an acquisition * * * is not an invasion of the sovereignty of a state. At the formation of the Union, the states delegated to the Federal Government authority to regulate commerce among the states. So long as the things done within the states by the United States are valid under that power, there can be no interference with the sovereignty of the state."

█ The conclusion seems inescapable that the state has no right of property in the bed of navigable waters that is greater than the right of the Government in these waters to foster or regulate commerce. An interstate pipeline, authorized by Congress, that runs along the bed of navigable waters is running across lands dominated by the Federal Government and the sovereignty of the state is thus not infringed. If the Government had decided to run the pipeline above Newark Bay instead of under it, and had constructed piers on the bed of the navigable waters, the situation would be analogous to that passed upon in Stockton v. Baltimore & N. Y. R. Co., supra. The use of the bottom of the waters for direct placement of the pipes. would seem to demand the same result. So much for the rights of the State, the discussion of which is necessitated by what follows.

█ The landowner who has been granted riparian rights is in no better position than the state which granted. those rights. The dominant right of the United States to the bed of navigable waters may not be avoided by a grant from the state to an individual. Bergen Point's right is no greater than that of the State. Federal rights in navigable waters must be all comprehending if they are to be consistently applied. The riparian landowner's rights, whatever their nature, are subject to a need for these rights for commerce. In United State v. Commodore Park, Inc., supra, the court said 324 U.S. at p. 391, 65 S. Ct. at p. 805:

> "In short, as against the demands of commerce, an owner of land adjacent to navigable waters, whose fast lands are left uninvaded, has no private riparian rights of access to the waters to do such things as 'fishing and boating and the like', for which rights the government must pay. Riparian rights of access to navigable waters, cannot, as against the government's power to control commerce, be bought and sold."

█ It is the finding of this court, from its construction of these opinions of the Supreme Court, that the United States Government has dominant rights. over all the bed of navigable waters, from high water mark to high water

mark, and not only over the navigable portion of the waters, to foster and engage in interstate commerce. Hence Bergen Point would not be entitled to compensation for the taking of that part of its lands up to high water mark, but would be entitled to be paid for the easement over its upland.

 Since both appraisers testified that the value of such taking is nominal, this court determines that Bergen Point is entitled to be compensated in the sum of $500.00 plus interest from date of taking.*

This opinion to serve as findings of fact and conclusions of law.

Let an order be entered.

---

* The figures used throughout are those actually used in testimony of the experts.