**R. B. RANDS et ux., Appellants,**

v.

**UNITED STATES of America,**
**Appellee.**
**No. 20280.**

United States Court of Appeals
Ninth Circuit.
Oct. 7, 1966.

Alex L. Parks, Lloyd B. Ericsson, Dusenbery, Martin, Beatty & Parks, Portland, Or., Robert B. Abrams, Mahoney & Abrams, Heppner, Or., for appellants.

Edwin L. Weisl, Jr., Asst. Atty. Gen., Roger P. Marquis, A. Donald Mileur, Attys., U. S. Dept. of Justice, Washington, D. C., Sidney I. Lezak, U. S. Atty., Joseph E. Buley, Asst. U. S. Atty., Portland, Or., for appellee.

Corey, Byler & Rew, Pendleton, Or., George W. Mead, Portland, Or., for amicus curiae, Pendleton Grain Growers.

Before BARNES, KOELSCH and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge.

Appellants owned two tracts of land along the Columbia River, about six miles upstream from the present John Day Dam. On November 1, 1962, they leased this and other property to the state of Oregon, which wanted it for an industrial park. That industrial development, for maximum utility, required access to the Columbia River; because two railroads and the United States owned most of the land along the river, appellants' property was especially valuable as a port site. The lease agreement gave Oregon an option to purchase the land. Most of the land was priced, under the option, at $150 per acre; the balance, denominated "port site property" in the agreement, was priced at $400 per acre.

The option was never exercised. On August 13, 1963, the United States filed a Declaration of Taking in the United States District Court, condemning this and other property in connection with the river development project of which the John Day Dam is a part. On September 25, 1963, the Secretary of the Army granted this and other land to the State of Oregon by a federal deed. Its use passed to a private corporation under a lease from the state of Oregon dated July 2, 1963. The record does not show and we are not told how much of the sale price or rents paid for the whole block of land involved are attributable to the two tracts in suit.

In response to the notice of taking, appellants filed a notice of appearance on September 3, 1963, contesting the amount of proposed compensation and requesting partial distribution of funds. On September 27 they filed a motion requesting permission to call their earlier appearance an answer and to amend it to raise defenses to the taking of their property. They assign as error the district court's refusal, under Rule 71A, F.R.Civ.P., to permit variance, under the excusable neglect provisions of Rules 6(b) and 60(b) from the requirement of Rule 71A that objections to the taking itself be filed within 20 days from service of the notice of taking. Upon trial of the compensation issue, the district court held, relying on United States v. Twin City Power Co., 1956, 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240, and United States v. Virginia Elec. & Power Co., 1961, 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed. 2d 838, that that element of value of the land arising from its utility as a port site is noncompensable under the Fifth Amendment. Appellants say that that holding too is erroneous.

I. *Late Amendment under Rule 71A, F.R.Civ.P.*

Rule 71A(e) provides that "If a defendant has any objection or defense to the taking of his property, he shall serve his answer within 20 days after the service of notice upon him." Part (a) of the same Rule makes the other rules of civil procedure applicable to condemnation actions "except as otherwise provided in this rule." The question, therefore, is whether the 20-day period is absolute, giving the district court no authority to extend it in cases of excusable neglect, or whether the excusable neglect provisions of Rules 6(b) (2) and 60(b) (1) confer such discretion.

District courts have held that Rule 6(b) is not applicable to mitigate the time bar of Rule 71A(e), United States v. 4.724 Acres of Land, E.D.La.1962, 31 F.R.D. 290, but that Rule 60(b) is so applicable, United States v. 140.80 Acres of Land, E.D.La.1963, 32 F.R.D. 11, 14, United States v. 1,108 Acres of Land, E.D.N.Y.1960, 25 F.R.D. 205, see also City of Davenport v. Three-Fifths of an Acre of Land, S.D.Ill.1957, 147 F.Supp. 794. The language of the rules themselves offers little guidance. The court below, in concluding that the word "shall" in 71A(e) should be construed to be mandatory, found guidance in the fact that subsection (c) (2) of the rule provides that a defendant "*may* answer as provided in subdivision (e) of this rule," and thought it persuasive that the word "shall" as used in Rule 59(b) has been construed as mandatory. But the inference drawn from use of both "may" and "shall" is unwarranted; if "shall" had been used in subdivision (c) (2), a defendant would be required to file an answer, while if "may" had been used in subdivision (e), in practical terms no due date would apply to the answer other than those provided by other rules. Nor is the fact that the "shall" in Rule 59(b) has been said to be mandatory, see Hulson v. Atchison, T. & S. F. Ry., 7 Cir., 1961, 289 F.2d 726, conclusive. Rule 6(b) is by its own terms inapplicable to Rule 59(b), while Hulson held Rule 60(b) to be applicable to Rule 59(b) upon a showing of "extraordinary circumstances".

A strong case can be made for the proposition that "shall", as used in 71A (e), is permissive. The rule itself contains no language requiring a different conclusion. The Advisory Committee's

note to subdivision (e) manifests no intent that the twenty-day limit be absolute —on the contrary, it seems to reflect an intent to cut off pleadings preliminary to the answer, not subsequent to it, and states that "[t]he general standard of pleading is governed by other rules * * * and this subdivision (e) merely prescribes what matters the answer should set forth." Rule 6(b) lists the other rules to which it is inapplicable, without including Rule 71A in that list. And the rules are to be construed in a liberal manner which effectuates their purpose "to secure the just, speedy, and inexpensive determination of every action" (Rule 1); here the Government itself conceded that appellants should be permitted to file a late answer.[1]

But we need not finally decide here whether the rule is mandatory or permissive, for in either case we think the result below was correct. The trial judge held alternatively that, assuming that he had discretion in the matter, he would deny the motion because "the defendants made no attempt to raise the question until after a substantial portion of the property had been transferred to the State of Oregon." Where, as here, the only "excusable neglect (Rule 6(b)) or "mistake, inadvertence, surprise, or excusable neglect" (Rule 60(b)) alleged is the defendant's original attorney's lack of knowledge of possible defenses to the taking, a substantial quantity of the land taken has been reconveyed after the 20-day period has elapsed and before a late answer is attempted to be filed, and the prima facie right to take is as clear as it is here,[2] we think that denial of the motion was within the scope of the district judge's discretion.

## II. *Port Site Value.*

In support of its proposition that the port site value of land riparian to navigable water is not required to be paid upon condemnation, the Government relies principally upon United States v. Commodore Park, Inc., 1945, 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017; United States v. Twin City Power Co., 1956, 350 U.S. 222, 76 S.Ct. 259; and United States v. Virginia Elec. & Power Co., 1961, 365 U.S. 624, 81 S.Ct. 784 ("VEPCO"). In *Commodore Park,* land situated on a navigable inlet whose water was kept fresh by tidal flows was rendered less valuable when the government turned the inlet into a "stagnant pool" by dumping dredged material, accumulated in the course of rendering the connecting navigable bay more suitable for military vessels, across the mouth of the inlet. It was held that the resulting loss was noncompensable because "a riparian owner [does not] acquire a unique private right distinct from that held by all others, to have access to and enjoyment of navigable waters and to recover compensation from the government because deprived of that privilege by an authorized governmental change in a stream. * * * Whatever market value of riparian lands may be attributable to their closeness to navigable waters does not detract from the government's 'absolute' power, in the interests of commerce, to make necessary changes in a stream. In short, as against the demands of commerce, an owner of land adjacent to navigable waters, whose fast lands are left uninvaded, has no private riparian rights of access to the waters to do such things as 'fishing and boating and the like', for which rights the government must pay. Riparian rights of access to navigable waters, cannot, as against the government's power

---

1. The Government's Memorandum in Opposition to Motion to Amend, while contending that Rule 71A alone was applicable to these proceedings, concluded with:

    "It is the government's view that the affidavit on file in support of the motion does show circumstances which in justice to the defendants should allow them to now file an answer after the twenty days from the service have elapsed."

2. Here almost all of the two tracts involved were actually inundated by the waters of the reservoir created by the John Day Dam.

to control commerce, be bought and sold." 324 U.S. at 390–391, 65 S.Ct. at 805–806.

In *Twin City,* the defendant power company owned land on the banks of a navigable river and on which it intended to build a private power facility, which the government took for the same use. In response to the power company's claim that the power plant site element of value of the land was compensable, it was held that "[t]he flaw * * * is that the landowner here seeks a value *in the flow of the stream,* a value that inheres in the Government's servitude and one that under our decisions the Government can grant or withhold as it chooses. * * * That special location value is due to the flow of the stream * * * and in this case it is the water power that creates the special value, whether the lands are above or below ordinary high water. * * * It is no answer to say that these private owners had interests in the water that were recognized by state law. We deal here with the federal domain, an area which Congress can completely pre-empt, leaving no vested private claims that constitute 'private property' within the meaning of the Fifth Amendment. Location of the lands might under some circumstances give them special value, as our cases have illustrated. But to attach a value of water power to the Savannah River due to location and to enforce that value against the United States would go *contra* to the teaching of [United States v. Chandler-Dunbar Water Power Co., 1913, 229 U.S. 53, 69, 33 S.Ct. 667, 57 L.Ed. 1063]—'that the running water in a great navigable stream is capable of private ownership is inconceivable.' * * * To require the United States to pay for this water-power value would be to create private claims in the public domain." 350 U.S. at 225–228, 76 S.Ct. at 261–263. (Emphasis in original.)

*Vepco* was similar, except that there the government took the power company's easement of flow. It was held that no power site element of value could be awarded. The government here particularly relies on the Court's statement that "Thus, just as the navigational privilege permits the Government to reduce the value of riparian lands by denying the riparian owner access to the stream without compensation for his loss * * * [citations omitted], it also permits the Government to disregard the value arising from this same fact of riparian location in compensating the owner when fast lands are appropriated." 365 U.S. at 629, 81 S.Ct. at 788.

We do not find those cases as persuasive as does the Government. *Commodore Park* dealt only with foreclosure of a privilege of access to navigable waters, not with the taking or invasion of all or any part of the defendant's tangible realty. More importantly, that case holds only that the Government may, in the exercise of its power to promote navigation, deny access to navigable waters, not that that access must not be considered when in the course of a condemnation action it is shown to represent a part of the value of the land actually taken or invaded.[3]

The result in *Twin City* proceeded logically from an almost indistinguishable holding in *Chandler-Dunbar,* and absent language to the contrary cannot be said to have departed from the settled principles which are discussed below. Indeed, it expressly acknowledged that location value is compensable in some circumstances, and refrained from disapproval of *Chandler-Dunbar's* award of compensation for a private lock and canal, a use far more closely connected with "navigation" than its use as a port site. *Vepco,* read against its facts, goes no further than *Twin City.*

3. Such a holding would necessarily have overruled United States v. Chandler-Dunbar Water Power Co., supra, in part, as well as United States v. River Rouge Improvement Co., 269 U.S. 411, 46 S.Ct. 144, 70 L.Ed. 339 (which cases are dis-

cussed below). We find no evidence in any of the three cases discussed above of any such overruling intent, and cannot take upon ourselves what the Supreme Court has refrained from doing.

The Government claims, however, that power site value and port site value are logically indistinguishable because both depend upon proximity of the property involved to navigable water, and that the reference in the cases to the "flow of the stream" does not limit those holdings to flowing streams but rather is merely the result of the fact that those cases were concerned with flowing navigable waters. However persuasive this may be as a matter of logic, other considerations are weightier and are to the contrary. The historical treatment of analogous riparian location values and the statutory framework within which condemnation and reconveyance occur combine to convince us that port site value should be compensable under the Fifth Amendment.

The foundation of the cases upon which the Government relies is United States v. Chandler-Dunbar Water Power Co., 1913, 229 U.S. 53, 33 S.Ct. 667. There the defendant power company owned land upon the bank of St. Mary's River and subsurface land to the middle of the stream on which it had constructed, respectively, a by-pass lock and canal system and a dam for power generation. The United States, in furtherance of its purpose to improve the navigability of the stream, took all of this property. Compensation was denied for the power site value of the land, but granted as to other elements. According to the Court, "riparian owners upon public navigable waters have in addition to the rights common to the public, certain rights to the use and enjoyment of the stream, which are incident to such ownership of the bank * * *. These additional rights are not dependent upon title to the soil over which the river flows, but are incident to ownership upon the bank * * *. They have also the right of access to deep water, and when not forbidden by public law may construct for this purpose, wharves, docks, and piers in the shallow water of the shore." Id.

at 70, 33 S.Ct. at 674. Consequently compensation was allowed for the special value of the lock and canal and the land upon which it was situated for such purposes.[4] And as has been noted above, the Court in Twin City did not disapprove, much less overrule, this holding. That the principle is of some antiquity is illustrated by Boom Co. v. Patterson, 1878, 98 U.S. (8 Otto) 403, 408, 25 L.Ed. 206, which held that the location of certain islands in a navigable portion of the Mississippi River, which location gave them a peculiar value for purposes of constructing a log-retaining "boom", was properly an element for consideration in fixing the amount of compensation due the owner upon a taking by a state agency.

United States v. River Rouge Improvement Co., 1926, 269 U.S. 411, 46 S.Ct. 144 (construing 40 Stat. 901, 911, c. 155, § 6, now 33 U.S.C. § 595), establishes another part of this pattern. There a statute provided that where only a part of a parcel of land was taken for a river improvement project, the resulting award should be reduced by the amount of any direct benefit conferred upon the remaining land by the project. The trial court's overemphasis upon the government's continuing right to cut off the privilege of access to navigable water in the exercise of its overriding navigation servitude—which resulted in unduly reducing the "direct benefit" offset to the compensation award—was held error. "[A]n increase in the value of the remaining portion of any parcel of land caused by its frontage on the widened river, carrying a right of immediate access to and use of the improved stream, would constitute a special and direct benefit within the meaning of the statute * * *." Moreover, "[i]t is well settled that in the absence of a controlling local law otherwise limiting the rights of a riparian owner upon a navigable river, * * *. [citation omitted] he has, in addition to the rights com-

---

4. The government apparently did not object to a particular valuation of another parcel based upon its value "[f]or general wharf-age, dock, and warehouse purposes, disconnected with development of power in the rapids." Id. at 75, 33 S.Ct. at 676.

mon to the public, a property right, incident to his ownership of the bank, of access from the front of his land to the navigable part of the stream, and when not forbidden by public law may construct landings, wharves or piers for this purpose. * * * [Citations omitted.]" Id. at 415, 417–418, 46 S.Ct. at 146. The Court went on to note that these riparian rights are subject to the government's navigation servitude, but concluded that the mere existence of the government's power to reduce the value of riparian rights could not justify present valuation of them at a nominal amount; rather, they are to be valued in the light of a realistic estimate of the chance that the government will in fact exercise its servitude. This is directly contrary to the position which the Government takes in the case before us, but we think that the principles announced in this and other cases discussed above are still good law and find no intimation otherwise in the more recent pronouncements of the Supreme Court.

We also find support for this conclusion in the approach which Congress has taken to the problems inherent in condemnation for river development purposes. 33 U.S.C. § 595, whose predecessor was construed in River Rouge, supra, still provides that where only a part of a parcel of land is taken for a river development project, "the jury or other tribunal awarding the just compensation * * * shall take into consideration by way of reducing the amount of compensation or damages any special and direct benefits to the remainder arising from the improvement. * * *" Now the government argues that where all of the land is taken, that element of its value attributable to its riparian location cannot be taken into account in computing its value. This is a fundamental and inequitable inconsistency, designed to give the government the best of both worlds. But if it is fair to allow compensation to be reduced by resulting benefit to retained property, then fairness dictates that the additional value of property taken, attributable to the same source (here, riparian location), should be paid for.

The inconsistency and the unfairness of the government's position are cast into sharper relief by 33 U.S.C. § 578. That section allows the Secretary of the Army to sell excess land for port and industrial purposes to the states or state-created agencies upon his determination that such development "on land which is part of a water resource development project under his jurisdiction will be in the public interest; (2) that such development will not interfere with the operation and maintenance of the project; and (3) that disposition of the property for these purposes under this section will serve the objectives of the project within which the land is located * * *." It requires that any such sale be at "the fair market value of the land." Here just such a sale was made by the United States to the State of Oregon. Assuming that port site value is an element of fair market value as that phrase is used in this statute—and we think that, absent any contrary indication in the statute, it must be so understood— then the principles of Monongahela Nav. Co. v. United States, 1893, 148 U.S. 312, 337–338, 13 S.Ct. 622, 631, 37 L.Ed. 463 are applicable. There the government took a dam and associated lock and canal, passage through which was subject, under a franchise, to payment of a toll to the owner of the project. "[A]fter taking this property, the government will have the right to exact the same tolls the navigation company has been receiving. It would seem strange that if, by asserting its right to take the property, the government could strip it largely of its value, destroying all that value which comes from the receipt of tolls, and having taken the property at this reduced valuation, immediately possess and enjoy all the profits from the collection of the same tolls. In other words, by the contention this element of value exists before and after the taking, and disappears only during the very moment and process of taking. Surely, reasoning

which leads to such a result must have some vice, at least the vice of injustice."

Further support exists in the Submerged Lands Act, 43 U.S.C. §§ 1301–1343. That act, throughout its text and legislative history, see 1953 U.S.Code Cong. & Ad.News, pp. 1385–1640, reflects the concern of Congress that any ownership it might assert over lands beneath navigable waters not impede economic development in the States. See e. g., 1953 U.S.Code Cong. & Ad.News, pp. 1479–1481, 1525. Where Congress sought to confirm ownership of natural resources in the states, and through them, private persons, yet reserve certain rights to itself, it reserved only those rights which *Chandler-Dunbar* held were vested in the national government in the form of an overriding navigational servitude; 43 U.S.C. § 1301(e) defines the term " 'natural resources', without limiting the generality thereof," by listing certain of such resources, then concludes with a statement that the term "does not include water power, or the use of water for the production of power," which is the resource reserved to the United States. Section 1314(a) explicitly reserves to the United States "all its navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs, *all of which shall be paramount to, but shall not be deemed to include, proprietary rights of ownership, or the rights of* management, administration, leasing, *use, and development of the lands* and natural resources which are specifically recognized, confirmed, established, and vested in and assigned to the respective States and others * * *." (Emphasis added.)

To uphold the stand taken by the Government here would, we think, subvert this policy by inhibiting development of riparian property where the riparian na-

ture of that property contributes significantly to its value and there is a reasonable possibility that it may at some time be taken by the Government for its own use in some navigation-connected project. And this, under our reading of the existing law and in the face of a statutory scheme which should be read to provide fair treatment, we cannot do.[5]

 Here the land obviously had value as a port site. It had historically been so used, and appellants had granted the State of Oregon an option to purchase it for almost three times the apparent market price of contiguous, nonport site property. At trial, appellants made an offer of proof that the land was worth at least $50,000. They should be given a chance to prove their claims.

Reversed and remanded for a new trial on the issue of just compensation.

---

5. The courts of New York have reached the same result in Andrews v. State, Ct.Cl., 1959, 19 Misc.2d 217, 188 N.Y.S.2d 854, aff'd, 1960, 11 A.D.2d 599, 200 N.Y.S.2d 451, aff'd, 1961, 9 N.Y.2d 606, 217 N.Y.S. 2d 9, 176 N.E.2d 42, cert. denied, 1961, 368 U.S. 929, 82 S.Ct. 365, 7 L.Ed.2d 192.