337 F.2d 956
 UNITED STATES of America
v.
50 FOOT RIGHT OF WAY OR SERVITUDE IN, OVER AND ACROSS
CERTAIN LAND situated IN the CITY OF BAYONNE,
HUDSON COUNTY, NEW JERSEY, and Daniel A.
Ferenczi et al., Bergen Point
Iron Works, Appellant.
 No. 14605.
 United States Court of Appeals Third Circuit.
 Argued March 19, 1964.
Decided Oct. 30, 1964.
 
 Allan G. Freund, Carpenter, Bennett & Morrissey, Newark, N.J. (Samuel M. Coombs, Jr., Newark, N.J., on the brief), for appellant.
 A. Donald Mileur, Chief, Appellate Sect., Land Div., Dept. of Justice, Washington, D.C. (Ramsey Clark, Asst. Atty. Gen., David M. Satz, Jr., U.S. Atty., Newark, N.J., Roger P. Marquis, Marcus L. Beckner, Jr., Attorneys, Department of Justice, Washington, D.C., on the brief), for appellee.
 Before McLAUGHLIN, GANEY and SMITH, Circuit Judges.
 GANEY, Circuit Judge.
 
 
 1
 In an effort to relieve the shortage of petroleum products in the New York City area, which shortage was impeding the war effort, the Reconstruction Finance Corporation in 1943 decided to build a double pipeline from Longview, Texas, to the city of Bayonne, New Jersey, for the transporting of petroleum and allied products. For the purpose of obtaining part of the right of way for the pipelines, the United States in September of 1943 filed a condemnation petition on behalf of the Reconstruction Finance Corporation in the United States District Court for the District of New Jersey, condemning a strip of land fifty feet wide running through Hudson County, New Jersey. The proceeding was instituted under the authority of Executive Order No. 9217, U.S. Code Cong. Service 1942, p. 1023,[1] which in turn was authorized by the Second War Powers Act of 1942, empowering the President to acquire and dispose of such property as may be necessary for war purposes. The condemnation petition recites this authority and avers that the taking was necessary to prosecute the war then taking place. The petition was amended in May of 1945 to include the name of Bergen Point Iron Works.
 
 
 2
 When completed the pipeline traversed the bed of Newark Bay,[2] a navigable body of water subject to the ebb and flow of the tide. The lines cut diagonally in an easterly direction across the submerged land in front of Bergen Point's property in the city of Bayonne. This submerged land, belonging to Bergen Point, lies between the exterior line for piers adopted in 1877 and the ordinary highwater line, and has a slope of approximately 1 to 30. The exterior line for piers is a straight line while the ordinary highwater line is irregular; the measurement between the two lines at their furtherest separation is about 300 feet. The pipelines leave the Bay on the waterfront property of Bergen Point and then run across part of that property above the ordinary highwater line.
 
 
 3
 Several years after the condemnation proceedings were brought, the pipelines were sold or leased to a private concern.
 
 
 4
 After hearing testimony, the district court, sitting without a jury, determined that Bergen Point was entitled to compensation from the United States of $500 only for the right of way taken over the land above the highwater line. In so doing, the court relied upon three cases; United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940), United States v. Commodore Park, Inc., 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017 (1945), and Stockton, Attorney General of New Jersey v. Baltimore & N.Y. R.Co., 32 F. 9, 19-21 (C.C.N.J.1887), appeal dismissed 140 U.S. 699, 11 S.Ct. 1028, 35 L.Ed. 603. In the event that an appellate court might disagree with it on the determination that Bergen Point was not entitled to compensation for the interference with its riparian rights and its interest in the submerged land, the court found that $5,850 would be just compensation. 217 F.Supp. 882 (D.C.N.J.1963).
 
 
 5
 Bergen Point concedes that the United States has the power to take a right of way across the bed of a navigable body of water without the payment of compensation purely for the purpose of aiding commerce upon the waterways of the nation.[3] It maintains, however, that the purpose of laying the pipelines here is not in aid of navigation. It points out that the petition in condemnation did not even aver that the right of way taken by the United States is in aid of commerce upon a navigable waterway or for any other public purpose other than that which might be inferentially derived from the successful prosecution of the then existing war. Therefore, it insists that it should have been paid for the taking of the right of way over its property below the ordinary highwater line, and also for the interference with its access to the navigable portion of the Bay from its banks.
 
 
 6
 In United States v. River Rouge Improvement Co., 269 U.S. 411, at p. 419, 46 S.Ct. 144, at p. 147, 70 L.Ed. 339 (1926), the Supreme Court said: 'The right of the United States in the navigable waters within the several States is, however, 'limited to the control thereof for the purpose of navigation.' Port of Seattle v. Oregon & W. Railroad, 255 U.S. 56, 63 (41 S.Ct. 237, 239 (65 L.Ed. 500)). And while Congress, in the exercise of this power, may adopt, in its judgment, any means having some positive relation to the control of navigation and not otherwise inconsistent with the Constitution, United States v. Chandler-Dunbar Co., supra, 62 (229 U.S. 53 (33 S.Ct. 667), 57 L.Ed. 1063), it may not arbitrarily destroy or impair the rights of riparian owners by legislation which has no real or substantial relation to the control of navigation or appropriateness to that end. * * *' Also see Weber v. Board of Harbor Commissioners, 18 Wall. 57, 85 U.S. 57, 66, 21 L.Ed. 798 (1873).
 
 
 7
 Statements in later cases seem to broaden the rule set forth in the River Rouge case and permit the United States, without the paying of just compensation, to exercise its dominant servitude in navigable waters in the interest of commerce and not just navigation. However, we think the rule announced in River Rouge is still the law. The case, United States v. Appalachian Electric Power Co., supra, is not to the contrary. At page 425 of 311 U.S. at page 308 of 61 S.Ct. of its opinion, the Court said: 'In the River Rouge controversy, this Court spoke of the limitation 'to the control thereof for the purposes of navigation.' But there, too, it was a question of the riparian owner's use of his property for access to the channel, a use fixed by state law. The conclusion that the United States could not interfere, except for navigation, with his right of access to navigable water, required no appraisal of other rights.' Neither has United States v. Commodore Park, Inc., supra, changed the law. There, the decrease in the market value of riparian land resulted from operations of the United States for the improvement of navigation. The foundation of Stockton, Attorney General of New Jersey v. Baltimore & N.Y.R. Co., supra, seems to have been undermined by the River Rouge case. Moreover, the United States has paid the State of New Jersey for the right of way across the bed of Newark Bay.
 
 
 8
 If under local law the riparian land owner has no title to the submerged land adjacent to his land above the ordinary highwater line, or the 'riparian right' in question is not recognized, the United States need not pay for using the land (Barney v. City of Keokuk, 94 U.S. 324, 24 L.Ed. 224 (1877)), or for interfering with the alleged riparian right.
 
 
 9
 The State of New Jersey may convey submerged tidewater land within its borders to private owners for private use. Bailey v. Driscoll,19 N.J. 363, 117 A.2d 265 (1955). Bergen Point's claim to the submerged lands between the ordinary highwater line and the exterior line for piers adopted in 1877 is through its predecessors in title. The first one was the Central Railroad Company of New Jersey which received a grant of land in 1874 up to the then established pierhead line from the State of New Jersey. In 1877, a new exterior line for piers was established by the Board of Riparian Commissioners of New Jersey. This extended the outer limit of the submerged lands in question by about 25 feet. In addition, that State recognizes the right of access to navigable water by the riparian land owner. Bell v. Gough,23 N.J.L. 624 (E. & A., 1852). One of the purposes in granting the submerged land to the riparian land owners is to allow them such access. Bailey v. Driscoll, supra, 19 N.J. at 373-374, 117 A.2d at 270-271. In conjunction with that purpose, the riparian land owner may construct landings, wharves and piers to the limit of the exterior line for piers established in 1877.
 
 
 10
 If the right of way across Bergen Point's submerged land was taken in aid of navigation, which is a question of fact, the United States would not be required to pay for such taking. The district court did not decide this issue. Under its view of the law, such a finding was unnecessary. Considering the state of proof on that issue that court did not have a sufficient basis for making a finding in favor of the United States. Within the realm of reason the mere running of a pipeline over the bed of a navigable body of water cannot be considered as an aid to navigation or as bearing some positive relation to the control of navigation. The petition in condemnation did not aver nor was any proof offered from which the trial court could find that one of the purposes of the pipelines was to facilitate navigation. Hence, the United States failed to meet its burden on this issue, and should, therefore, be required to pay Bergen Point just compensation for the use of the submerged land and the interference with its access to navigable water, which the court found to be $5,850.
 
 
 11
 Bergen Point complains that the amount of $5,850 is insufficient compensation. To avoid the limitation on the scope of appellate review set forth in Rule 52(a) of the Federal Rules of Civil Procedure,[4] Bergen Point claims that the basic facts as to damages were not in dispute. It, therefore, argues that this court is not bound by the trial court's ultimate findings of fact. There is no question that the pipelines ran over a part of Bergen Point's property, but the extent to which the lines diminished or interfered with Bergen Point's access to navigable water and the value of that interference was vigorously disputed by counsel for the United States and Bergen Point. Most of the testimony elicited at the hearing centered on this point. What was said in Stephens v. United States, 235 F.2d 467 (1956), is apropos here. At page 471 of its opinion, the Court of Appeals for the Fifth Circuit said:
 
 
 12
 'Since the award is within the range of the credited testimony, and the commission was not bound to accept the valuation of any particular witness, we may not re-weigh the evidence in a de novo review or reverse merely because the commission found a valuation more closely based upon the testimony of the Government appraisers than upon that of the landowners' witnesses.'
 
 
 13
 Accordingly, the judgment of the district court will be reversed and the matter will be remanded with direction to enter judgment in favor of Bergen Point Iron Works and against the United States in the amount of $5,850 plus interest from the date of the taking.
 
 
 
 [1]
 This Order appearing in 7 F.R. 6177, reads as follows:
 'By virtue of and pursuant to the authority vested in me by Title II of the Second War Powers Act, 1942, approved March 27, 1942 (Public Law 507, 77th Congress), the Reconstruction Finance Corporation is hereby authorized to exercise the authority contained in the said Title II of the Second War Powers Act, 1942, to acquire, use, and dispose of any real property, temporary use thereof, or other interest therein, together with any personal property located thereon, or used therewith, that the Corporation shall deem necessary for military, naval or other war purposes.
 Franklin D. Roosevelt
 The White House,
 August 7, 1942.'
 
 
 [2]
 The Bay, bounded by New Jersey on the north, east and west, and by Staten Island, New York, on the south, connects with Upper New York Bay on the east through Kill Van Kull, and with Raritan Bay to the south through Arthur Kill
 
 
 [3]
 Concerning the nature of the navigational servitude, the Supreme Court, in United States v. Virginia Electric Co., 365 U.S. 624, at pages 627-628, 81 S.Ct. at pp. 784, 787-788, 5 L.Ed.2d 838 (1961), stated:
 'This navigational servitude-- sometimes referred to as a 'dominant servitude,' Federal Power Commission v. Niagara Mohawk Power Corp., 347 U.S. 239, 249 (74 S.Ct. 487, 493, 98 L.Ed. 686), or a superior navigation easement,' United States v. Grand River Dam Authority, 363 U.S. 229, 231 (80 S.Ct. 1134, 1136, 4 L.Ed.2d 1186)-- is a privilege to appropriate without compensation which attaches to the exercise of the 'power of the government to control and regulate navigable waters in the interest of commerce.' United States v. Commodore Park, 324 U.S. 386, 390 (65 S.Ct. 803, 805, 89 L.Ed. 1017). The power 'is a dominant one which can be asserted to the exclusion of any competing or conflicting one.' United States v. Twin City Power Co., 350 U.S. 222, 224-225 (76 S.Ct. 259, 260-261, 100 L.Ed. 240); United States v. Willow River Power Co., 324 U.S. 499, 510 (65 S.Ct. 761, 767, 89 L.Ed. 1101). A classic description of the scope of the power and of the privilege attending its exercise is to be found in the Court's opinion in United States v. Chicago, M., St. P. & P.R. Co.: (312 U.S. 592, 61 S.Ct. 772, 85 L.Ed. 1064)
 "The dominant power of the federal Government, as has been repeatedly held, extends to the entire bed of a stream, which includes the lands below ordinary high-water mark. The exercise of the power within these limits is not an invasion of any private property right in such lands for which the United States must make compensation. (Citing cases.) The damage sustained results not from a taking of the riparian owner's property in the stream bed, but from lawful exercise of a power to which that property has always been subject.' 312 U.S. 592, 596-597 (61 S.Ct. 772, 775, 85 L.Ed. 1064).'
 
 
 [4]
 In part, this rule provides: 'Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.'