

1996 Decisions

7-24-1996

# United States v. 30.54 Acres of Land

Precedential or Non-Precedential:

Docket 95-3237,95-3296

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"United States v. 30.54 Acres of Land" (1996). *1996 Decisions.* Paper 112.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/112

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 95-3237 & 95-3296
_____


UNITED STATES OF AMERICA

v.

30.54 ACRES OF LAND,
MORE OR LESS, SITUATED IN GREENE COUNTY,
COMMONWEALTH OF PENNSYLVANIA

James V. Filiaggi and Josephine Filiaggi,
Husband and Wife, Lawrence E. Filiaggi
and Helen Filiaggi, Husband and Wife,
and L&J Equipment Company, Inc.,
                            Appellants*

*Pursuant to Rule 12(a), F.R.A.P.


_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 92-cv-00033)
_____


Argued June 4, 1996

Before:  SCIRICA and ROTH, Circuit Judges
         and O'NEILL, District Judge*

(Filed  July 24, 1996)


        LAWRENCE G. ZURAWSKY, ESQUIRE (ARGUED)
        Zurawsky & Keck
        428 Forbes Avenue
        415 Lawyers Building
        Pittsburgh, Pennsylvania 15219



*The Honorable Thomas N. O'Neill, Jr., United States District
Judge for the Eastern District of Pennsylvania, sitting by
designation.

MICHAEL D. DeMARCO, ESQUIRE
DeMarco & Associates
707 Grant Street
946 Gulf Tower
Pittsburgh, Pennsylvania 15219

     Attorneys for Appellants


JACQUES B. GELIN, ESQUIRE (ARGUED)
United States Department of Justice
P.O. Box 23795
L'Enfant Plaza Station
Washington, D.C. 20026

BONNIE R. SCHLUETER, ESQUIRE
Office of the United States Attorney
633 United States Post Office
  & Courthouse
Pittsburgh, Pennsylvania 15219

     Attorneys for Appellee

_____

OPINION OF THE COURT
_____


SCIRICA, Circuit Judge.

     The United States Army Corps of Engineers prohibited the use of the landowners' coal loading facility and coal tipple because they posed a danger to navigation on the Monongahela River.  The landowners now seek just compensation for the deprivation of the use of their property under the Fifth Amendment to the Constitution and Section 111 of the River and Harbors Act of 1970, 33 U.S.C.   595a (1988).  Because the navigational servitude was a preexisting limitation on the landowners' title to riparian land, we hold the Corps' exercise of the servitude to prohibit the use of the landowners' property was not a taking under the Fifth Amendment or Section 111.

                    I.  Background

     James Filiaggi and others (the "landowners") owned 132.55 acres on the Monongahela River in Greene County, Pennsylvania.  A coal loading facility was located on the tract, and a coal tipple, grounded on the property, extended approximately one hundred feet into the Monongahela River.  The tipple and coal loading facility have been used for loading coal into barges since 1914.

     On January 7, 1992, in connection with the Grays Landing Lock and Dam Project, the United States, on behalf of the Army Corps of Engineers, filed a complaint and declaration of

taking in the United States District Court for the Western District of Pennsylvania. The United States acquired 30.54 acres of the landowners' tract at a cost of $86,700. The Government did not acquire the remaining 102 acres of the tract on which the coal loading facility was located and on which the tipple was grounded.

Although the United States acquired neither the coal loading facility nor the tipple, the Army Corps of Engineers subsequently prohibited their operation. The Corps of Engineers concluded:

> the loading and unloading of the barges at the tipple site will [create a hazard to navigation]. Due to the close proximity of the tipple to the lock and dam (approximately 1,000 ft.) the operation of the coal loading facility poses a safety hazard to the river boat pilots who would be required to maneuver in and about it and about the danger zone of the lock and dam. The operation of the facility also poses a hazard to the operation of the lock and dam. Specifically, if a barge or a river boat were to break away, there would be little if any response time to prevent it from going over the dam or causing damage thereto. The Corps of Engineers is responsible for the control and regulation of the navigation of the Monongahela River. It will not permit coal loading operations to continue in the area of the tipple.

App. at 47-48.

The landowners sought over $300,000 in compensation for the loss of the use of the tipple, coal loading facility, and the remaining 102 acres in the district court. They argued the Government's prohibition on the use of the tipple and coal loading facility resulted in a taking by depriving them of all economically reasonable use of their remaining 102 acres. See Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992). They also argued that Section 111 of the River and Harbors Act mandates a determination of compensation for the remaining tract based upon its use as a coal loading facility for barges.

On the United States' motion for summary judgment, the district court held that the United States did not take the landowners' property by prohibiting the use of the tipple and coal loading facility. See Memorandum Opinion, United States v. 30.54 Acres of Land, More or Less, Situated in Greene County, Commonwealth of Pennsylvania, No. 92-33, slip op. at 5 (W.D. Pa. March 15, 1995). Rather, it concluded, the United States had regulated the use of a navigable river under the "navigational" servitude, and although economic loss resulted, no compensation was due. Id. at 5-6. The district court also held that Section 111 of the River and Harbors Act does not apply to regulation of navigable waterways under the navigational servitude, id. at 7, and therefore the landowners were not entitled to compensation.

The district court had jurisdiction over this eminent

domain action under 28 U.S.C. 1358. We have jurisdiction over final orders of the district court under 28 U.S.C. 1291.

Our review of the district court's grant of summary judgment is plenary. Western United Life Assur. Co. v. Hayden, 64 F.3d 833, 837 (3d Cir. 1995).

## II. Discussion

### A. The "Navigational Servitude" and Compensation for Takings of Riparian Land

The Fifth Amendment to the United States Constitution requires the payment of just compensation for private property taken for public use. U.S. Const. Amend. 5. But the United States is not constitutionally required to pay for economic losses resulting from the exercise of its "navigational" servitude--its power to regulate the use of navigable waterways-- because navigable waterways have always been under the exclusive control of the federal government under the Commerce Clause. As stated by the Supreme Court in United States v. Rands, 389 U.S. 121 (1967):

> The Commerce Clause confers a unique position upon the Government in connection with navigable waters. . . . [T]hey are the public property of the nation, and subject to all the requisite legislation by Congress. This power to regulate navigation confers upon the United States a "dominant servitude," which extends to the entire stream and the stream bed below the ordinary high-water mark. The proper exercise of this power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject. Thus, without being constitutionally obligated to pay compensation, the United States may change the course of a navigable stream or otherwise impair of destroy a riparian owner's access to navigable waters, even though the market value of the riparian owner's land is substantially diminished.

Id. at 122-23 (citations omitted); see also Owen v. United States, 851 F.2d 1404, 1408 (Fed. Cir. 1988).

The navigational servitude does not relieve the Government of its obligation to pay just compensation for takings of fastlands above the high-water mark. But the Constitution "permits the Government to disregard the value arising from [the] fact of riparian location in compensating the owner when fast lands are appropriated." United States v. Rands, 389 U.S. at 123-24. The value of land that arises from its riparian location "does not inhere in these parcels," "but depends on use of water to which the [landowner] has no right as against the United

States."  Id. at 124.

Congress can, of course, provide relief where the exercise of the navigational servitude causes economic loss, even though the United States is not constitutionally required to pay compensation.  One instance of congressional action to grant such relief is Section 111 of the River and Harbors Act of 1970, 33 U.S.C.  595a.  Section 111 provides that in cases of takings of above the high-water mark real property, just compensation will be calculated on the basis of a tract's riparian location, even though United States v. Rands makes clear that the Constitution does not require consideration of the tract's location.  Section 111 provides, in relevant part:

> In all cases where real property shall be taken by the United States for the public use in connection with any improvement of rivers, harbors, canals, or waterways of the United States, and in all condemnation proceedings by the United States to acquire lands or easements for such improvements, the compensation to be paid for real property taken by the United States above the normal high water mark of navigable waters of the United States shall be the fair market value of such real property based upon all uses to which such real property may reasonably be put, including its highest and best use, any of which uses may be dependent upon access to or utilization of such navigable waters.

33 U.S.C.  595a.  While Section 111 alters the method of calculation of just compensation for takings of above high-water mark riparian land, it does not alter the underlying determination of what constitutes a taking under the Fifth Amendment.  Nor does Section 111 alter any other aspect of established law on the navigational servitude.

B.    Takings under Lucas v. South Carolina Coastal Council

The landowners argue that the Government's prohibition on the use of the tipple and coal loading facility stripped the 102 acres remaining in their possession of all economically reasonable uses.  Relying on Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992), they assert that this prohibition constituted a taking under the Fifth Amendment.

Lucas established that economic regulations can result in a taking, even though the Government does not formally condemn property.  "[W]hen the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking."  Id. at 1019 (emphasis in original).  But Lucas also noted that when "the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with," id. at 1027, regulations proscribing such uses do not result in a taking.

The Supreme Court explicitly recognized the

navigational servitude as a pre-existing limitation on riparian landowners' estates.  See id. at 1028-29 (citing the navigational servitude as a case when "we assuredly would permit the government to assert a permanent easement that was a pre-existing limitation upon the landowner's title.") (emphasis in original). Because the navigational servitude is a pre-existing limitation on the title of riparian property--indeed the limitation is almost as old as the republic itself, see Gibbons v. Ogden, 22 U.S. (9 Wheat) 1, 189-193 (1824)--exercise of the servitude cannot constitute a taking, even where it deprives a landowner of all economically reasonable use of his land.  United States v. Cherokee Nation of Okla., 480 U.S. 700, 704 (1987) ("the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject"); United States v. Rands, 389 U.S. at 122 (same).  Accordingly, even were the landowners to establish that the Government's prohibition on the use of the tipple and coal loading facility deprived them of all economically reasonable uses of their land (and they have not yet established this fact), there was no taking.  From the time the tipple and coal-loading facility commenced operation in 1914, the landowners' right to operate them was subject to the navigational servitude and the possibility that the Government might exercise the servitude to prohibit their use.  Exercise of the servitude did nothing more than realize a limitation always inherent in the landowners' title.  It was not a taking.

      C.  Section 111 of the River and Harbors Act of 1970

      The landowners argue that Section 111 of the River and Harbors Act of 1970, 33 U.S.C.  595a, requires the Government to compensate them for the prohibition on the use of the tipple and coal loading facility.  They note that Section 111 applies to condemnation proceedings and to "cases where real property shall be taken . . . for the public use in connection with any improvement of rivers."  They assert the Government's prohibition on the use of the tipple and coal loading facility was a "taking" within the meaning of Section 111.

      There is no reason to suppose that Congress referred to takings in Section 111 in any other than a constitutional sense. As discussed, the Government's exercise of the navigational servitude to prohibit the use of the tipple and coal loading facility was not a taking under the Fifth Amendment. Accordingly, it would appear that Section 111, by its terms, does not apply.

      In any event, Section 111 only applies to "real property taken by the United States above the high water mark." Here the United States did not acquire above the high-water mark real property (other than the original 30.54 acres); rather, it prohibited use of the tipple--a structure jutting one hundred feet into a navigable waterway.  Section 111 does not require compensation for prohibition of the use of such a structure.  Cf.United States v. Certain Parcels of Land, Etc. (City of Valdez), 666 F.2d 1236, 1238 (9th Cir. 1982) ("private improvements connected to fastlands but located in the navigable waters may be

altered or removed by the Government to improve navigation without compensating the owner").

The landowners also argue that Section 111 "was adopted to limit or abrogate the harsh provisions of the earlier doctrine of the `navigational servitude,'" and therefore the navigational servitude does excuse payment of just compensation. But Congress did not express an intent to abolish the navigational servitude or to provide compensation for all economic losses occasioned by regulation of navigable waterways. The legislative history of Section 111 indicates that Congress intended to modify the rule of United States v. Rands only to the extent of paying full compensation based on riparian location in cases of actual acquisition of above the high-water mark real property. Section 111 "makes no change in existing law" with respect to other aspects of the navigational servitude. H. R. Rep. No. 1665, 91st Cong. 2d Sess. 30-31 (1970). We will not alter long-established law or abridge the navigational servitude in the absence of explicit legislation from Congress.

### III.  Conclusion

The Government's exercise of the navigational servitude to prohibit use of the tipple and coal loading facility did not result in a taking of the landowners' property. The navigational servitude was always a limitation inherent in the landowners' title, and therefore exercise of the servitude was not a taking.

Nor was there a taking within the meaning of Section 111 of the River and Harbors Act. Its provisions do not apply. We will affirm the judgment of the district court.