PALM BEACH ISLES ASSOCIATES, a Florida Partnership; Martin Slifka, individually and as trustee; Marjorie Margolis and Roberta Franklin, individuals as tenants in common; and the Estate Of Joseph Slifka, represented by Alan Slifka and Barbara J. Slifka, co-executors, Plaintiffs–Appellants,

v.

UNITED STATES, Defendant–Appellee.

No. 99–5030.

United States Court of Appeals, Federal Circuit.

March 31, 2000.

Luther M. Taylor, of Palm Beach Gardens, Florida, and Michael John Ryan, of Juno Beach, Florida, argued for plaintiffs-appellants.

Ethan G. Shenkman, Attorney, Appellate Staff, Environment Division, Department of Justice, argued for defendant-appellee. On the brief were Lois J. Schiffer, Assistant Attorney General, Susan V. Cook, John A. Bryson, and Tamara N. Rountree, Attorneys. Of counsel on the brief was Dorothy Boardman, Office of Counsel, U.S. Army Corps of Engineers, of Jacksonville, Florida.

John D. Echeverria, Georgetown University Law Center, of Washington, DC, for amicus curiae Florida Audubon Society.

Before PLAGER, LOURIE, and CLEVENGER, Circuit Judges.

PLAGER, Circuit Judge.

This is an inverse condemnation — regulatory taking — case, on appeal from the United States Court of Federal Claims. Palm Beach Isles Associates, Martin Slifka, Marjorie Margolis and Roberta Franklin, and the Estate of Joseph Slifka (collectively "PBIA") claim that the United States (the "Government") effected a regulatory taking of their property in Florida when the Army Corps of Engineers (the "Corps") refused to grant a permit to dredge and fill the property. The Court of Federal Claims granted the Government's motion for summary judgment of no liability. *See Palm Beach Isles Assocs. v. United States*, 42 Fed. Cl. 340 (1998).

PBIA appeals the ruling of the Court of Federal Claims. Because a genuine issue of material fact regarding the applicability of the federal navigational servitude is in dispute, an issue on which the outcome of the case hinges, summary judgment was improvidently granted. The judgment of the Court of Federal Claims is vacated, and the case is remanded for further proceedings consistent with this opinion.

## BACKGROUND

In 1956, a group of investors bought 311.7 acres of land in Florida for $380,190. With various transfers through the years, primarily by devise and inheritance, this group eventually became PBIA.[1] The property is located north of Palm Beach on a long spit of land which sits between the Atlantic Ocean on the east and Lake Worth on the west. A road traverses the spit from north to south, and splits the property into two parcels. Of the 311.7 acres, 261 acres are east of the road, and constitute upland oceanfront property. This parcel was sold in 1968 to a developer for some $1 million; it is not as such involved in this law suit.

The remaining 50.7 acres are located west of the road. This 50.7 acre parcel consists of 1.4 acres of shoreline wetlands adjacent to the road, and 49.3 acres of submerged land adjacent to the wetlands. The submerged acreage lies below the mean high water mark, in the bed of Lake Worth. It is this 50.7 acre parcel that is the subject of this action.

Lake Worth is a long, narrow, shallow body of water having a north-south orientation. At one time the lake was a landlocked freshwater lake, but years ago a cut, Lake Worth Inlet, was made across the spit that separates the lake from the ocean, and as a result the lake is now a tidal water with direct access to the ocean. Lake Worth serves as a segment of the Atlantic Intracoastal Waterway ("ICW"). A channel has been dredged along the western shore of the lake to provide a readily-navigable passage for vessels. As a part of the ICW, Lake Worth is considered a navigable water of the United States, and thus the submerged portion of PBIA's property lies in the bed of a navigable water of the United States.

Under the Rivers & Harbors Act of 1899 (codified at 33 U.S.C. §§ 401–467 (1994 & Supp. III 1997)), anyone who wishes to perform work that impacts a navigable water of the United States must obtain a permit from the Corps. Section 10 of the Act, 33 U.S.C. § 402 (1994), specifically covers dredging and filling. PBIA was therefore required to obtain permits from the Corps in order to dredge and fill the parcel.

Shortly after purchasing the property, in 1957, PBIA applied for and received from the Corps the necessary permits to dredge and fill the 50.7 acres. The permits were renewed in 1960. However, PBIA never performed the work and the permits expired in 1963.

---

1. While the legal ownership of the property was a significant issue before the Court of Federal Claims, it is not at issue before us, and we therefore use "PBIA" to represent all the various past as well as current members of the ownership group.

■ Some twenty-five years later, in 1988, PBIA applied to the State of Florida Department of Environmental Regulation ("DER") for a permit, as now required by state law, to dredge and fill the submerged lake bottom it owned, along with the adjoining wetlands. After the DER in 1990 denied the permit on environmental grounds, PBIA sued the DER and the Trustees of the Internal Improvement Fund of the State of Florida, the state agency from whom PBIA derived its title to the property.[2] Eventually a settlement of the suit was reached. The State acknowledged that, pursuant to the deed from the Trustees, PBIA had the legal right to erect a bulkhead around the submerged land and fill the 50.7 acres. The settlement stipulated that the State would not interfere with PBIA's efforts to obtain permits from the Corps.

PBIA again applied to the Corps for the dredge and fill permits required by the Rivers & Harbors Act. Meanwhile, however, in 1972, Congress had passed the Clean Water Act (codified at 33 U.S.C. §§ 1251–1376 (1994 & Supp. III 1997)). Section 404 of the Clean Water Act, 33 U.S.C. § 1344 (1994), also requires a permit from the Corps for dredging and filling navigable waters of the United States, and requires that environmental concerns be taken into account in deciding whether to grant such a permit. After consulting with the State of Florida, the Corps denied the permits.

The Corps' denial letter made clear that the denial was primarily predicated on environmental grounds and the requirements of the Clean Water Act, but the Memorandum accompanying the denial letter also stated:

(11) Navigation: Shallow water depths that already exist in the proposed project area have limited boating activities to shallow draft vessels. Therefore, other than the elimination of [49.3] acres of navigable waters, the project should not have a significant adverse impact on navigation, in general.

After the denial of the permits, PBIA filed suit in the Court of Federal Claims, claiming that the denial of the permits prevents any economically viable use of the 50.7 acres and therefore constitutes a regulatory taking of the parcel. PBIA requested more than $10 million as compensation for the taking.

The Court of Federal Claims found that the 49.3 acres, which lie below the mean high water mark, are part of the bed of Lake Worth and are subject to the federal navigational servitude, citing *United States v. Rands*, 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967), and *Owen v. United States*, 851 F.2d 1404 (Fed.Cir.1988) (en banc). Citing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), the Court of Federal Claims ruled that the navigational servitude was a "pre-existing limitation upon the landowner's title," 505 U.S. at 1029, 112 S.Ct. 2886, and therefore "the proscribed use interests were not part of [the owner's] title to begin with," *id.* at 1027, 112 S.Ct. 2886. In this circumstance, concluded the court, there was no taking despite the total loss of value for the land.

With regard to the 1.4 adjacent acres of wetlands, the Court of Federal Claims again found no taking on three grounds. First, it determined that the 1.4 acres should be viewed not as a separate parcel

2. Title to the beds of navigable waters of the United States is either in the state in which the waters are located, as a matter of state sovereignty, or in the owners of the land bordering the waters. Whether in the one or the other is a question of state law. See *United States v. Chandler–Dunbar Water Power Co.*, 229 U.S. 53, 60, 33 S.Ct. 667, 57 L.Ed. 1063 (1913). In Florida, title to the beds of navigable waterbodies is held by the state in public trust; the Trustees of the Internal Improvement Fund administer the trust, and in general have power to convey submerged lands to private owners if the sale is not contrary to the public interest. In the early years of Florida's development, much of the State's sovereignty land was so conveyed. See F.E. Maloney, S.J. Plager, & F.N. Baldwin, *Water Law and Administration: The Florida Experience* §§ 120–128 (1968) (ch. 12: Title to Beds Under Navigable Waters).

in itself, but rather as a part of the whole initial 311.7 acre parcel, for which PBIA had received adequate compensation when it sold the 261 acres for $1 million. Second, the Court of Federal Claims held that PBIA knew when it bought the property that it would need permits to develop the land (as evidenced by its 1957 and 1960 filings), and thus the existing statutory regime precluded any reasonable investment-backed expectation of being able to develop the property. Finally, the court found that the 1.4–acre section by itself is insufficient for building homes, and PBIA had not established that all other uses were foreclosed. The Government's summary judgment motion was granted.

## DISCUSSION

In reviewing a district court's grant of summary judgment, we must make an independent determination as to whether the standards for summary judgment have been met. *See Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994); *Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1560 (Fed.Cir.1991); *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 673 (Fed.Cir.1990). We view the evidence in a light most favorable to the non-movant, and draw all reasonable inferences in its favor. *See SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed.Cir.1985) (en banc). A motion for summary judgment is properly granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c).

■ The analytical method for examining a regulatory taking claim is set forth in *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171 (Fed.Cir.1994). *Loveladies Harbor* extensively reviewed the law of regulatory takings as it stood prior to the Supreme Court's decision in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798

(1992), and then explained the impact of *Lucas* on that body of law. As a result of this analysis, *Loveladies Harbor* described the law of regulatory takings in the following manner:

> a) A property owner who can establish that a regulatory taking of property has occurred is entitled to a monetary recovery for the value of the interest taken, measured by what is just compensation.
>
> b) With regard to the interest alleged to be taken, there has been a regulatory taking if
>
>> (1) there was a denial of economically viable use of the property as a result of the regulatory imposition;
>>
>> (2) the property owner had distinct investment-backed expectations; and
>>
>> (3) it was an interest vested in the owner, as a matter of state property law, and not within the power of the state to regulate under common law nuisance doctrine.

28 F.3d at 1179.

■ Subsequently, again citing *Lucas*, this court explained in *Florida Rock Indus. v. United States*, 18 F.3d 1560 (Fed. Cir.1994), that "[i]f a regulation categorically prohibits *all* economically viable use of the land — destroying its economic value for private ownership — the regulation has an effect equivalent to a permanent physical occupation. There is, without more, a compensable taking." *Id.* at 1564–65.[3] *Florida Rock* went on to point out that even when the taking is considered "categorical," *Lucas* preserved for the Government a nuisance defense to such a taking claim. *See id.* at 1565 n. 10. Thus, when the analysis of prong (1) reveals that the regulatory imposition has deprived the owner of *all* economically viable use of the property (a "categorical taking"), then the only remaining issue is the Government's defense under prong (3).

---

**3.** Anything in subsequent cases inconsistent with this analysis cannot, of course, change the law (absent a decision *en banc* ), under the doctrine of *South Corp. v. United States*, 690

F.2d 1368 (Fed.Cir.1982). *See, e.g., Good v. United States*, 189 F.3d 1355, 1361 (Fed.Cir. 1999).

# 1380

## I. Denial of Economically Viable Use and the Denominator Problem

■ Because the analysis of a regulatory takings claim differs depending on whether there has been an alleged total deprivation of economically viable use or only a partial deprivation, we first address the question whether the Corps' permit denials preclude *all* economically viable use of the property. If that is so, then, as we have noted, we are dealing with a categorical taking, and the Government's available defense to the takings claim lies in showing that the property owner's rights are subject, as a matter of basic property law, to the Government's asserted regulatory imposition. Whether the asserted imposition causes a total wipeout or something less (see *Florida Rock* for a discussion of the implications of "something less") depends in a case such as this on what is the economically relevant parcel — the "denominator problem."[4] We must decide if the whole 311.7 acre parcel is the relevant denominator, as argued by the Government and found by the Court of Federal Claims, or whether the relevant parcel is the 50.7 acres for which the permit was denied, as argued by PBIA. This is a conclusion of law, based on the facts of the case.

The Government argues that since the land was purchased together, it should all be treated as one parcel. PBIA should not be allowed to sever the part that is subject to regulation from the part that is not. The value of the part sold in 1968 should be considered as part of the denominator in assessing the proportionate value of the 50.7 acres.

PBIA counters that the two parcels have never been part of a common development scheme; their only link was that they were purchased at the same time. PBIA points out that the two parts are separated by a road, they are different types of property,

subject to different zoning, and PBIA applied for its original permits only for the lakeside property because PBIA never planned to develop the entire property as a unit. PBIA also notes that the oceanfront property was sold in 1968, before the now-existing regulatory fabric came into place.

*Loveladies Harbor* helps cast some light on this issue. Loveladies Harbor, Inc. ("Loveladies") had purchased 250 acres in 1958, with the intention of development under a comprehensive scheme. By the 1970s, Loveladies had developed 199 of the acres and wished to develop the remaining 51. Loveladies applied to the state of New Jersey for the requisite dredge and fill permits, but the state denied permission. After Loveladies sued the state, the two sides compromised, allowing Loveladies to develop 12.5 acres in exchange for conserving the remainder. Loveladies then applied to the Corps for the necessary federal dredge and fill permits. New Jersey, contrary to the compromise, opposed the permits, and they were denied.

Loveladies filed suit in the Court of Federal Claims, claiming a taking of the 12.5 acres. The Court of Federal Claims agreed and ordered the Government to pay for the land. The Government appealed. One of the issues on appeal was whether the denial of the permits caused a total wipeout of the economic value of the 12.5 acres, treated as a separate economic entity, or whether the economic value taken as a result of the denial should be considered as a fraction of the total economic value of the entire development, the 250 acres. In the latter case, there would be no denial of all economically viable use of the property, and the full regulatory takings analysis, including the question of distinct investment-backed expectations, would be applicable.

This court agreed with the trial court's conclusion that the proper parcel was the

4. The problem is referred to as the denominator problem because, in comparing the value that has been taken from the property by the imposition with the value that remains in the property, "one of the critical questions is determining how to define the unit of property whose value is to furnish the denominator of the fraction." *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (internal quotes and citation omitted).

12.5 acres. The 199 acres were developed over a substantial period of years starting in 1958, at a time when New Jersey had not yet put in place a comprehensive environmental program for wetlands protection. Furthermore, as a result of prior litigation in the case, the State had essentially conceded that under its law the property owner had the right to develop the 12.5 acres independent of any prior development. We concluded that the earlier-developed property was not a part of the denominator.

In the instant case, the Court of Federal Claims found the relevant parcel to be the 311.7 acres. The court based its conclusion, *inter alia*, on the Government's assertion that the regulatory structure under the Rivers and Harbors Act that led to the permit denials was in place before the 261 acres were sold in 1968, and therefore they should be included in the denominator.

The timing of property acquisition and development, compared with the enactment and implementation of the governmental regimen that led to the regulatory imposition, is a factor, but only one factor, to be considered in determining the proper denominator for analysis. As we said in *Loveladies Harbor*, "[o]ur precedent displays a flexible approach, designed to account for factual nuances." 28 F.3d at 1181. In a given case, other factors may be more compelling.

In this case, PBIA never planned to develop the parcels as a single unit.[5] Furthermore, PBIA bought the land in 1956 and sold the 261 acres in 1968, both events occurring before the environmental considerations contained in the Clean Water Act came into play, beginning in 1972. It is inappropriate to consider those transactions to have occurred in the context of the substance of a regulatory structure that was not in place at the relevant times.

The regulatory imposition that infected the development plans for the 50.7 acres was unrelated to PBIA's plans for and disposition of the 261 acres of beachfront upland on the east side of the road. The development of that property was physically and temporally remote from, and legally unconnected to, the 50.7 acres of wetlands and submerged lake bed on the lake side of the spit. Combining the two tracts for purposes of the regulatory takings analysis involved here, simply because at one time they were under common ownership, or because one of the tracts sold for a substantial price, cannot be justified. The trial court's conclusion to the contrary was error.

■ Once the proper parcel is defined as the 50.7 acres, it becomes clear that, without the dredge and fill permits, the entire 50.7 acres, including the 1.4 acres of wetlands, have no or minimal value.[6] Thus, the facts are uncontrovertible that the permit denial has the effect of denying the property owner *all* economically viable use of the property, and, since the State has stipulated that the property owner under state law has the right to dredge and fill, the denial by the Corps of the permits constitutes a categorical taking of the 50.7 acres by the Federal Government. The Court of Federal Claims erred in holding otherwise.

Since there is a categorical taking of the 50.7 acres, the issue of PBIA's investment-backed expectations under prong (2) of the *Loveladies Harbor* analysis is not applicable. We move to the Government's asserted defense under prong (3).

## II. The Government's Power to Regulate and the Navigational Servitude

The key issue here (and the factor distinguishing it from *Loveladies Harbor*) is

---

5. Cf. *Forest Properties, Inc. v. United States,* 177 F.3d 1360, 1365–66 (Fed.Cir.1999) (nine acres of lake bed were part of 62–acre parcel because owner always treated parcel under single development plan).

6. See p. 1386 for the explanation of why the 1.4 acres of wetlands are included in this discussion of the 50.7–acre tract.

whether the navigational servitude defense is available to the Government in this case.

### A.

 The question to be addressed first in this context is whether the submerged 49.3 acres are subject to the navigational servitude. The "navigational servitude" derives from the Commerce Clause of the Constitution,[7] and gives the United States Government a "dominant servitude"—a power to regulate and control the waters of the United States in the interest of commerce. *See United States v. Rands*, 389 U.S. 121, 122–23, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967).

PBIA argues that the water depth over the 49.3 acres (1–3 feet) is insufficient to support commercial navigation, and thus does not implicate the navigational servitude. Under this view, the underlying land would not be subject to it. According to PBIA, the fact that Lake Worth as a whole is navigable is irrelevant; only the navigability of the 49.3 acre portion matters. The Government counters that navigation need not be "commercial" to implicate the navigational servitude, and the mere ability of the water to support even small boats is sufficient to implicate it; since Lake Worth as a whole is navigable, the entire body up to the mean high water mark is subject to the navigational servitude, regardless of particular depths.

 A review of the relevant authorities and precedent indicates that the Government's understanding of the concept of federal navigability is closer to correct than is PBIA's,[8] and that the property is subject to the navigational servitude.[9] In *Rands* the Supreme Court noted that the navigational servitude "extends to the entire [navigable] stream and the stream bed below ordinary high-water mark." 389 U.S. at 123, 88 S.Ct. 265. This court later cited *Rands* and other Supreme Court precedent and said that

"[l]and or property within the bed [of a navigable waterbody] are always subject to (or burdened with) the potential exercise of the navigational servitude," and that "the Supreme Court has left no doubt that the high-water mark bounds the bed of the [navigable body]." *Owen v. United States*, 851 F.2d 1404, 1409 (Fed.Cir.1988) (en banc). Thus, since the parcel at issue lies below the high water mark, is part of the bed of Lake Worth, and Lake Worth is a navigable water of the United States, the parcel is subject to the navigational servitude. The particular water depth over PBIA's land is not controlling.

### B.

The next question is the application of the navigational servitude to a purported regulatory taking. This is an issue of first impression in this court. We therefore review the relevant precedent on the application of the navigational servitude and fit it into the analytical framework of controlling Supreme Court law regarding regulatory takings, as enunciated in that Court's decision in *Lucas*.

### 1.

 The Supreme Court's seminal decision in *Lucas* refined and clarified the structure for analyzing regulatory takings. As explained in *Loveladies Harbor*, the third prong of the takings analysis derived from the Supreme Court's *Lucas* decision provides the Government with a defense to what would otherwise be a regulatory taking. The Supreme Court described the defense as follows:

> Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed interests were not part of his title to begin with.

---

7. U.S. Const. art. I, § 8, cl. 3.

8. *See generally* Maloney, Plager, & Baldwin, *supra*, § 22: The Navigability Concept.

9. *See* G. Pisarski, *Testing The Limits of the Federal Navigational Servitude*, 2 Ocean & Coastal L.J. 313 (1997).

505 U.S. at 1027, 112 S.Ct. 2886. The Court tied this exception to the common law of nuisance, saying that

> confiscatory regulations ... must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership. A law or decree with such an effect must, in other words, do no more than duplicate the result that could have been achieved in the courts—by adjacent landowners ... under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally....

*Id.* at 1029, 112 S.Ct. 2886.

■■ The Court went on to explain further the rationale for this nuisance defense, as well as its application. The common law of nuisance makes unlawful certain conduct by property owners, and the State may convert these implicit background principles into explicit laws without thereby effecting a taking. *See id.* at 1030, 112 S.Ct. 2886. When a regulation that forbids all economically beneficial uses of the land goes beyond these background principles, however, the Government must pay compensation. *See id.* Thus, in order to assert this defense, the Government must "identify background principles of nuisance and property law that prohibit the uses he now intends in the circumstances in which the property is presently found. Only on this showing can the State fairly claim that, in proscribing all beneficial uses, the [regulatory action] is taking nothing." *Id.* at 1031–32, 112 S.Ct. 2886.

■■ The Court also mentioned the navigational servitude in this context, stating "we assuredly would permit the government to assert a permanent easement that was a pre-existing limitation upon the landowner's title.... *Scranton v. Wheeler,* 179 U.S. 141, 163, 21 S.Ct. 48, 45 L.Ed. 126 (1900) (interests of 'riparian owner in the submerged lands ... bordering on a public navigable water' held subject to Government's navigational servitude)." 505 U.S. at 1028–29, 112 S.Ct. 2886. Thus, the Supreme Court seems to suggest that, though much of the discussion in *Lucas* focused on property rights as defined by state law, the United States Government could assert the federal navigational servitude as a defense against a regulatory takings claim.

A recent Third Circuit case arrives at that conclusion. *See United States v. 30.54 Acres of Land,* 90 F.3d 790 (3d Cir.1996). The Corps of Engineers had exercised its eminent domain power to obtain 30.54 acres of land from the plaintiffs, who operated a coal loading facility on the Monongahela River. The land was needed in conjunction with the Grays Landing Lock and Dam project. The plaintiffs were left with 102 acres on which the coal loading facility and a coal tipple were located.

Subsequently the Corps informed plaintiffs that they could no longer load and unload barges at the tipple site, as that activity posed a navigational hazard because of its proximity to the lock and dam. The landowners then sought some $300,-000 additional compensation for their losses as a result of the Corps' order, alleging that a regulatory taking had occurred.[10]

---

10. Absent an express statutory grant of jurisdiction to the contrary, a regulatory taking claim against the United States is a Tucker Act claim, exclusive jurisdiction for which lies in the Court of Federal Claims (if in excess of $10,000, as this one was). *See Broughton Lumber Co. v. Yeutter,* 939 F.2d 1547 (Fed.Cir. 1991); *Bowen v. Massachusetts,* 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). The district court referred to the landowners as "defendants," thus suggesting that it viewed their claim as part of the Government's original condemnation action, over which it had jurisdiction under 28 U.S.C. § 1358, the eminent domain statute. *See United States v. 30.54 Acres of Land* 1995 WL 901987 (W.D.Pa. Mar.15, 1995). However, the district court also noted that "the tipple and the land surrounding the tipple are not subject to the instant condemnation proceeding." *Id.* at *1. Apparently the jurisdictional question was not raised; the Court of Appeals opinion makes no note of it, beyond a citation to § 1358.

The district court denied relief, concluding that the Government had lawfully exercised its powers under its navigational servitude. That conclusion, and the judgment for the Government, were affirmed by the Third Circuit:

> The Government's exercise of the navigational servitude to prohibit use of the tipple and coal loading facility did not result in a taking of the landowners' property. The navigational servitude was always a limitation inherent in the landowners' title, and therefore exercise of the servitude was not a taking.

90 F.3d at 796.

In light of our understanding of *Lucas* and the other cases we have considered, we hold that the navigational servitude may constitute part of the "background principles" to which a property owner's rights are subject, and thus may provide the Government with a defense to a takings claim. As noted by the Supreme Court, the navigational servitude is "a preexisting limitation on the landowner's title." *Id.* In a case in which the navigational servitude applies, a denial of permits to dredge and fill may "do no more than duplicate the result that could have been obtained by the courts." *Id.* at 1029, 112 S.Ct. 2886.

## 2.

The effect of the Government's invocation of the navigational servitude as a defense to a regulatory taking, in a case in which it properly applies, is to give the Government a defense to the alleged taking. As the Supreme Court said in *Rands:*

> The proper exercise of [the navigational servitude] power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of

riparian owners have always been subject.

389 U.S. at 123, 88 S.Ct. 265.

With regard to what constitutes "proper exercise" of the navigational servitude, the Government takes the position here that the servitude is absolute, and that essentially there never can be a taking of property that is in a waterbody subject to the navigational servitude. The Government concedes that in the case before us its stated rationale for denying the permits was environmental, but it asserts that it also had a navigational purpose, and therefore even if the navigational servitude is not absolute there was no taking. PBIA counters that the navigational servitude only protects the Government when it regulates the use of private property if the purpose of the regulation is related to navigation. In the present case, PBIA argues, the permit denials were predicated on environmental grounds, not navigational grounds.

The precedents clearly establish that the Government's purpose must be related to navigation if it wishes to avoid paying compensation for the regulation or control of private property. In a straightforward declaration on this point, the Supreme Court said:

> The right of the United States in the navigable waters within the several States is, however, "limited to the control thereof for purposes of navigation." *Port of Seattle v. Oregon [& Wash. R. Co.],* 255 U.S. 56, 63, 41 S.Ct. 237, 65 L.Ed. 500 [(1921)]. And while Congress, in the exercise of this power, may adopt, in its judgment, any means having some positive relation to the control of navigation and not otherwise inconsistent with the Constitution, *United States v. Chandler–Dunbar Co.* [229 U.S. 53, 62, 33 S.Ct. 667, 57 L.Ed. 1063 (1913)], it may not arbitrarily destroy or impair the rights of riparian owners by legislation which has no real or substantial relation to the control of navigation or appropriateness to that end.

*United States v. River Rouge Improvement Co.,* 269 U.S. 411, 419, 46 S.Ct. 144, 70 L.Ed. 339 (1926); *see also United States v. Gerlach Live Stock Co.,* 339 U.S. 725, 737, 70 S.Ct. 955, 94 L.Ed. 1231 (1950) (rejecting the Government's claim of immunity for the Central Valley Project under the navigational servitude rubric, finding that the project's purpose was reclamation, not navigation: "Claimants ... observe that this court has never permitted the Government to pervert its navigational servitude into a right to destroy riparian interests without reimbursement where no navigation purpose existed."); Pisarki, *supra,* at 325–26, 335–36 (relationship to navigation required for valid exercise of navigational servitude); *cf. United States v. Twin City Power Co.,* 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956) (project whose purposes included power generation along with flood control and improving low-water flows for navigation held to be subject to the navigational servitude: "If the interests of navigation are served, it is constitutionally irrelevant that other purposes may also be advanced."); *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) (Government could not require public access to privately owned waterbody without paying just compensation, even if waterbody otherwise within definition of "navigable waters of the United States").

In *Owen,* this court noted the issue, commenting that "no compensation is owed when the government takes such land or property [*i.e.,* land or property subject to the navigational servitude] *as the result of aiding the navigability* of the stream." 851 F.2d at 1409 (emphasis added).

The Third Circuit addressed a case with direct parallels to the present one. *See United States v. 50 Foot Right of Way in Bayonne, New Jersey,* 337 F.2d 956 (3d Cir.1964). The United States had condemned a route for a pipeline needed for the war effort. The jury awarded compensation to the Bergen Point Iron Works only for the right of way taken over its land above the high water mark, but not

for the right of way taken across its submerged land, or for its loss of access to the navigable waters that was blocked by the pipe. Bergen Point sued the United States for a taking. The district court held that no compensation was due, essentially because the navigational servitude was absolute. *See id.* at 958. The court of appeals cited the above-quoted passage from *River Rouge,* and then held:

> If the right of way across Bergen Point's submerged land was taken in aid of navigation, which is a question of fact, the United States would not be required to pay for such taking.... Within the realm of reason the mere running of a pipeline over the bed of a navigable body of water cannot be considered as an aid to navigation or bearing some positive relation to the control of navigation. The petition in condemnation did not aver nor was any proof offered from which the trial court could find that one of the purposes of the pipelines was to facilitate navigation. Hence, the United States failed to meet its burden on this issue, and should, therefore, be required to pay Bergen Point just compensation for the use of the submerged land and the interference with its access to navigable water....

337 F.2d at 960. The court awarded Bergen Point damages for the taking. *See id.* at 961.

█ Thus it is clear that in order to assert a defense under the navigational servitude, the Government must show that the regulatory imposition was for a purpose related to navigation; absent such a showing, it will have failed to "identify background principles ... that prohibit the uses [the landowner] now intends." *Lucas,* 505 U.S. at 1031, 112 S.Ct. 2886.

█ In the present case, we are unable to determine whether the Government has made a sufficient showing of a navigational purpose behind the permit denial. The denial letter itself refers only to the "elimination of 50.7 acres of important Lake Worth shallow water habitat"; it makes no

mention of navigation. [A230] The Memorandum accompanying the denial letter does discuss navigation, but its findings are contradictory. The Memorandum states that the project area currently allows "limited boating activities to shallow draft vessels" and granting the permit would result in "the elimination of [49.3] acres of navigable waters," language which appears to support a finding of a navigational purpose. [A242–43] However, the Memorandum goes on to conclude that "the project should not have a significant adverse impact on navigation, in general." [A243]

In support of its motion for summary judgment, the Government submitted the Declaration of Donald Borda, the Project Manager who prepared the denial and the accompanying Memorandum. Mr. Borda's Declaration purported to "clarify" the conflicting statement from the Memorandum, and to link the permit denial more closely to the exercise of the navigational servitude. However, Mr. Borda's Declaration is not consistent with the language of the Memorandum, and PBIA vigorously contests the Declaration's assertions. Thus, the issue of whether the Government had a navigational purpose for its permit denial is a disputed material fact, and the Court of Federal Claims erred in granting summary judgment. Cf. 50 Foot Right of Way, 337 F.2d at 960 (navigational purpose is a question of fact).

Because there is a disputed issue of material fact, we vacate the judgment of the trial court, and remand the case for further development of this issue. On remand, the Court of Federal Claims should determine whether the Government had bona fide navigational grounds for its permit denial. If so, the Government will have sustained its defense under Lucas, and there will be no taking. If, on the other hand, the Government cannot demonstrate that it denied the permit on navigational grounds, then its defense under the navigational servitude fails.

We have focused this discussion on the 49.3 acres of submerged land, though addressing in general the entire 50.7 acres. The trial court concluded that, without development of the 49.3 acres of submerged land, the 1.4 acres of adjoining wetlands would be of little, if any, value. Upon full examination of the record, we see no error in that conclusion. If there is a taking by the Government of the 49.3 acres, then there also must be a taking of the adjoining wetlands as well, and PBIA will be entitled to compensation therefor; if there is no taking because of the navigational servitude, the developmental value of the adjacent wetlands strip standing alone would be at most nominal — the attorney for PBIA admitted as much in oral argument — and in any event PBIA has failed to establish that no other uses are available to it.

### III.

One final issue remains. PBIA moved before the Court of Federal Claims for reassignment of the case because of alleged excessive delay by the trial judge in making her ruling. Shortly after the motion was filed, the judge issued the ruling that is before us. PBIA now asserts that the ruling should have been held in abeyance until its motion had been ruled upon.

We note that PBIA filed its motion under the wrong version of the Rules of the Court of Federal Claims ("RCFC"). PBIA filed its motion under 28 U.S.C. § 372(c) and RCFC App. B1, which deal with complaints of judicial misconduct. However, Appendix B was replaced in 1993 with a new set of Rules for Judicial Misconduct in the Court of Federal Claims. Current Misconduct Rule 1(e) ("Limitations on use of the procedure") specifically excludes use of the complaint procedure to "force a ruling on a ... matter that has been before the judge too long."[11] The motion should have been filed under RCFC 77(f)(1), which authorizes the Chief Judge of the Court of Fed-

---

11. PBIA also failed to follow Rule 2, which designates a specific procedure using a specif-

ic form that must be followed for filing a complaint.

eral Claims to reassign cases: "The chief judge may reassign any case if the chief judge deems such action necessary for the efficient administration of justice."

For understandable reasons the trial judge may have reacted negatively to the filing of an inappropriate disciplinary complaint. PBIA states in its brief that thirty days after the motion was filed the trial court ruled, but that the judge's judicial assistant informed plaintiffs' counsel that the motion had to be withdrawn before a copy of the opinion would be sent. If this is true, such a demand was equally inappropriate.

It appears from the record that the motion has yet to be ruled upon. On remand, we expect that the first order of business before the trial court will be consideration and disposition of the motion. We trust that such consideration will result in a resolution of the issue satisfactory to all concerned.

## CONCLUSION

The decision of the Court of Federal Claims is

*VACATED AND REMANDED.*

## COSTS

Each party shall bear its own costs.